**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GARY M. BLOOM,<br>Plaintiff,<br><br>v.<br><br>JENNIFER SIMS,<br>TIFFANY RICHER, a/k/a TIFFANY ATWOOD,<br>RPM TALENT AGENCY,<br>MICHAEL A. LEVINE,<br>POWERFUL STORY LINES LLC,<br>SHELLEY A. PIÑA, d/b/a GOLDEN PINEAPPLE MANAGEMENT,<br>JOHN EDWARD KEOUGH, and<br>MANNY JAE MEDIA, LLC,<br>Defendants. | ) | Civil Action No.<br><br>Jury Trial Demanded |

# COMPLAINT FOR A CIVIL CASE

## RELATED CASE STATEMENT

Pursuant to Local Rule 40.1(g), Plaintiff states that this action is related to *Bloom v. Campbell*, Civil Action No. 1:24-cv-10339-RGS (the "Related Action"), currently pending before this Court and currently stayed as to the sole defendant, William James Campbell III, by reason of his pending Chapter 13 bankruptcy case, *In re William J. Campbell III*, No. 1:26-bk-11090-VK (Bankr. C.D. Cal.). This action shares a party with the Related Action (Plaintiff is the plaintiff in both actions), involves the same or substantially similar issues of fact, and arises out of the same occurrence, transaction, and course of conduct — Campbell's systematic misrepresentation of authorship in the same nine creative works at issue in the Related Action, and the conduct of the individuals and entities named as Defendants here concerning Campbell

and those works. Six Defendants here (Sims, RPMTA, Powerful LLC, Piña, Keough, and Manny LLC) were proposed defendants in the Related Action, and both actions involve claims concerning the copyrights in the same works. See L.R. 40.1(g)(1). The basis for this designation is also stated in the Civil Cover Sheet and Category Form filed with this Complaint.

Plaintiff sought to join six of the Defendants in the Related Action, but leave was denied and the Related Action is now stayed, so Plaintiff files this action to protect expiring statutes of limitations.

## INTRODUCTION

Plaintiff Gary M. Bloom hereby files this Complaint against: Defendants Jennifer Sims (individually and as a partner of RPM Talent Agency); Tiffany Richer (a/k/a Tiffany Atwood, individually and as a partner of RPM Talent Agency); RPM Talent Agency; Shelley A. Piña (a/k/a Shelley Piña Roth, individually and d/b/a Golden Pineapple Management); John Edward Keough; Manny Jae Media, LLC; Michael A. Levine; and Powerful Story Lines LLC; seeking damages and equitable relief (some of which may depend on prior rulings in the Related Action on the ownership of the works at issue) for fraud, aiding and abetting fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, breach of fiduciary duty, tortious interference, defamation, intentional infliction of emotional distress, civil conspiracy, copyright infringement, falsification of copyright management information, unfair and deceptive acts and practices, and an accounting, under the statutory and common law of the Commonwealth of Massachusetts and federal copyright law.

This case arises from a scheme by William James Campbell III to misrepresent his authorship of nine different creative works (the "PROJECTS") in order to induce Plaintiff's legal and creative services, and from the conduct of the Defendants named herein concerning

those projects, including misrepresentation, breaking promises made to Plaintiff, interfering with his contracts and business relationships, excluding him from the projects, and exploiting his contributions without compensation. Campbell is not named as a defendant in this action. Campbell is the debtor in a pending Chapter 13 bankruptcy case in the Central District of California, and Plaintiff's claims against Campbell are being pursued in the Related Action, which is stayed while the bankruptcy case is pending. Nothing in this Complaint should be construed as an attempt to obtain relief against Campbell, to determine the merits of any claim against Campbell, or to exercise control over any property of Campbell's bankruptcy estate. Campbell's conduct is described herein only as necessary background to the claims asserted against the Defendants who are named.

## PARTIES

1. Plaintiff Gary M. Bloom ("Plaintiff") is an individual and a citizen of Massachusetts.

2. RPM Talent Agency (hereinafter "RPMTA") is a talent agency and, on information and belief, a partnership, as held out by its two partners: Defendant Sims (a citizen of California) and Defendant Richer (a citizen of California). RPMTA operates from a virtual office space located at 2600 W. Olive Ave., 5th Floor, Burbank, California.

3. Defendant Jennifer Sims ("Sims") is a citizen of California and a partner in RPM Talent Agency.

4. Defendant Tiffany Richer ("Richer"), also known as Tiffany Atwood, is a citizen of California and a partner of RPM Talent Agency. Richer holds a California talent agency license issued to "Tiffany Richer DBA RPM Talent" (Registration No. TA-LR-1001203660). Defendant Richer has claimed that RPMTA is a sole proprietorship, which is contrary to how RPMTA has been held out to the public.

5. Sims has held herself out as a partner of RPMTA, including in her email signatures and on RPMTA's website, as alleged below.

6. At all relevant times, Sims acted as a partner, agent, or employee of RPMTA, and within the scope of that relationship, in representing Campbell, in promising to send Plaintiff a shopping agreement, and in shopping and marketing the PROJECTS. Sims's acts and knowledge in that capacity are attributable to RPMTA. Sims has sworn that since January 2014 she has continuously provided "talent representation services for the Talent Agency" (Related Action, Docket No. 276-3 ¶¶ 4, 7, 8).

7. On information and belief, Richer, as a partner of RPMTA, controlled RPMTA's website and consented to RPMTA's holding Sims out as its partner.

8. Richer, as a partner of RPMTA, is jointly and severally liable for RPMTA's obligations under each Count asserted against RPMTA. In the alternative, if RPMTA is a sole proprietorship of Richer, as Richer has sworn in the Related Action (Related Action, Docket No. 276-4 ¶¶ 6, 7), then RPMTA is the trade name under which Richer does business; Sims acted as Richer's agent in the conduct alleged herein; and Richer is liable for Sims's acts within the scope of that agency and, having consented to Sims's being held out as her partner, as if Sims were her partner.

9. Defendant Powerful Story Lines LLC (hereinafter "Powerful LLC") is a New Mexico limited liability company formed on or about July 13, 2025. Its members at formation were William James Campbell III (a citizen of California at formation, not a party to this action), Defendant Sims (a citizen of California), Defendant Michael A. Levine (a citizen of California), and Brian Avery (upon information and belief, a citizen of California). Sims and Avery ceased to be members of Powerful LLC on or about March 19, 2026, leaving Campbell and Levine as

its only remaining members. Powerful LLC remains registered as an active limited liability company with the New Mexico Secretary of State as of the date of this Complaint.

10. Defendant Michael A. Levine ("Levine") is a citizen of California. Levine was engaged as a composer in connection with one or more of Campbell's creative projects beginning in 2023. Levine was the Organizer of record who filed Powerful LLC's Articles of Organization on July 13, 2025. Following the departure of Sims and Avery in March 2026, Levine is one of Powerful LLC's only two remaining members, holding a 50% membership interest.

11. Defendant Shelley A. Piña (hereinafter "Piña"), also known as Shelley Piña Roth, is a citizen of California and operates individually and as a talent manager doing business as Golden Pineapple Management (hereinafter "GPM") from a virtual office space located at 2600 W. Olive Ave., 5th Floor, Burbank, California. GPM is, on information and belief, a sole proprietorship without separate legal entity status.

12. Defendant Manny Jae Media, LLC (hereinafter "Manny LLC") is a Massachusetts limited liability company with its principal office in Worcester, Massachusetts.

13. Defendant John Edward Keough ("Keough") is a citizen of Massachusetts, domiciled in Worcester, Massachusetts, and a principal of Manny LLC.

## JURISDICTION

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a), which gives federal courts exclusive jurisdiction over copyright actions. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiff's federal claim under 17 U.S.C. §§ 1202 and 1203.

15. This Court has supplemental jurisdiction over the state and common law claims against all Defendants, including Keough and Manny LLC, pursuant to 28 U.S.C. § 1367, because

those claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

16. This Court has personal jurisdiction over Sims based on her intentional interference with Plaintiff's contractual and prospective business relationships, including reneging on her written promise, made in October 2023, to send Plaintiff a shopping agreement for projects involving Campbell in which Plaintiff had an ownership interest, followed by her shopping of those projects to Plaintiff's exclusion; and her participation, as a founding member of Powerful LLC, in the Massachusetts-directed marketing described below. Sims made her promise to Plaintiff knowing that he was a Massachusetts resident. Sims's conduct was purposefully directed toward Massachusetts, depriving him of business opportunities in and beyond Massachusetts, and Plaintiff's claims against Sims arise from this conduct.

17. This Court has personal jurisdiction over RPMTA and Richer because Sims's Massachusetts-directed conduct described in the preceding paragraph was undertaken as a partner or agent of RPMTA and Richer and within the scope of that relationship.

18. This Court has personal jurisdiction over Piña, who engaged in conduct intentionally directed toward Massachusetts, including tortious acts such as: (a) intentionally interfering with the Massachusetts-based legal services contract between Plaintiff and Campbell, a business deal, and prospective business relationships in Massachusetts; (b) defamation of Plaintiff to Massachusetts-based counsel and a producer; and (c) attempts to coerce Plaintiff into refraining from pursuing financial compensation from Campbell. Plaintiff's claims against Piña arise directly from these acts.

19. This Court has personal jurisdiction over Keough as a citizen of Massachusetts.

20. This Court has personal jurisdiction over Manny Jae Media, LLC as a Massachusetts limited liability company with its principal office in Worcester, Massachusetts.

21. This Court has personal jurisdiction over Powerful LLC. Powerful LLC operated a website actively marketing *Money Tree*, *WILBUR*, and *Cat-Astrophe* — three of the works at issue in this action and the Related Action — to the public, including to Plaintiff, a Massachusetts resident whose ownership interest in *Money Tree* and contractual financial interests in *WILBUR* and *Cat-Astrophe* the marketing directly undermined. Powerful LLC's marketing conduct was purposefully directed at, and caused injury within, Massachusetts.

22. This Court has personal jurisdiction over Levine. Levine formed Powerful LLC as its Organizer of record and was a founding member throughout its marketing of the PROJECTS. As a controlling member of Powerful LLC — one of only two remaining members following the departure of Sims and Avery — Levine exercised control over an entity whose marketing conduct was purposefully directed at Massachusetts as described in the preceding paragraph. Levine's own creative works were marketed on the same website alongside the works at issue in this action, giving him a direct and personal financial interest in that Massachusetts-directed marketing activity. Plaintiff's claims against Levine arise from and relate to that conduct.

23. For the above reasons, exercising personal jurisdiction over Sims, RPMTA, Richer, Piña, Powerful LLC, and Levine is consistent with the Due Process Clause of the United States Constitution and Massachusetts law. Each defendant purposefully directed conduct toward Massachusetts, Plaintiff's claims arise directly from that conduct, and the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.

24. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

25. On October 14, 2020, *Money Tree* was registered with the United States Copyright Office under Registration No. PAu004062783, which lists Chris Esper and Campbell as claimants.

26. On March 7, 2021, *Money Tree* was registered under Registration No. TXu002242158, which lists Esper as sole claimant, and Esper and Campbell as authors.

27. In September 2021, after Christopher Rennie and Caroline "Carrie" Fishbane stopped working with Campbell on the screenplay later known as *ESCALATOR Feature*, Campbell brought in his talent manager, Piña, to resolve the dispute (Related Action, Rennie, Docket No. 38 ¶¶ 17–20; Fishbane, Docket No. 37-1 ¶¶ 18–19).

28. On September 17, 2021: (a) at 9:17 p.m. ET, Fishbane emailed Campbell that, unless he wanted "to buy the rights to the script from me and Chris," they hoped never to hear from him again; (b) Campbell replied at 9:18 p.m. and 9:19 p.m. ET, "Sure buy it from me," and "It's MY IDEA"; and (c) at 9:34 p.m. ET, Campbell forwarded the exchange to Fishbane and Piña, telling them to "Talk."

29. On September 17, 2021: (a) at 9:41 p.m. ET, Piña emailed Fishbane, inviting her and the others "to reach out to me so we can figure out a solution"; and (b) at 9:50 p.m. ET, Fishbane replied that she and Rennie "have proof in the Celtx document history that we wrote probably over 99% of the current draft so if he intends to use any of it, we expect to be compensated."

30. On September 17, 2021, at 10:36 p.m. ET, Piña replied to Fishbane: "Feel free to send the offer to my email.. I will present it to William and then I'll make the decision on the solution."

31. On September 17–18, 2021: (a) at 10:54 p.m. ET on September 17, Fishbane confirmed to Piña that there were no written agreements and offered screenshots of the Celtx history proving her and Rennie's contributions; (b) at 11:28 p.m. ET, Piña asked, "are you saying you have NO signed agreements or contracts between entities?"; and (c) at 12:00 a.m. ET on September 18, Rennie emailed Fishbane and Piña screenshots of the Celtx edit history documenting his and Fishbane's year-long authorship of the script.

32. In 2022: (a) Campbell brought Keshia Willi onto *Money Tree*; and (b) Willi attended investor meetings with Campbell, Dakota Michaels, and Esper concerning *Last Door*, *Money Tree*, and other projects (Related Action, Docket No. 207-2 ¶ 17A).

33. On or about February 28, 2023: (a) Campbell contacted Plaintiff, a Massachusetts attorney, via Facebook for legal assistance on an unrelated matter; and (b) Plaintiff declined to represent Campbell on that matter.

34. When Campbell contacted Plaintiff, Campbell was living in Pennsylvania with his mother, Patricia Campbell, who supported him financially.

35. Campbell held himself out as a professional screenwriter working on nine creative projects: the short version of the *See You Later, Escalator* screenplay ("*ESCALATOR Short*"), the feature-length version of the *See You Later, Escalator* screenplay ("*ESCALATOR Feature*"), the *Serene* pilot screenplay ("*Serene*"), the feature-length *The Last Door* screenplay ("*Last Door*"), the feature-length *The Money Tree* screenplay ("*Money Tree*"), the *Open House* musical script ("*Open House*"), the feature-length *The Obstacle* screenplay ("*Obstacle*"), the *Wilbur the Whompin' Wallaby* video game and animated video project ("*WILBUR*"), and the *Cat-Astrophe* animatics video project ("*Cat-Astrophe*") (collectively, the "PROJECTS").

36. Campbell represented to Plaintiff that he was: (a) the sole writer of *ESCALATOR Short*, *ESCALATOR Feature*, and *Obstacle*; (b) one of only two equally-contributing co-writers of *Serene*, *Last Door*, *Open House*, and *Money Tree*; and (c) the sole creative behind *WILBUR* and *Cat-Astrophe*.

37. Campbell was co-writing *Serene* and *Last Door* with Willi.

38. Campbell was a client of Sims, a voice talent agent with RPMTA, who was also helping to cast and promote *Money Tree* and other PROJECTS.

39. Campbell was in communication with Michaels, an investment broker, regarding funding for *Money Tree*.

40. Campbell was working with Andrew Austin, an animator, on a pitch deck for *Money Tree*.

41. Campbell sought Plaintiff's services to help monetize the PROJECTS by negotiating and closing production deals.

42. On or about March 13, 2023: (a) Plaintiff read *ESCALATOR Short* and *Serene* and reviewed the *WILBUR* materials; (b) the names of Michael Das and Rusty Gilligan appeared on the title page of *ESCALATOR Short*; and (c) Campbell assured Plaintiff that the title page was incorrect, that he was the sole writer, and that Das and Gilligan had made no contribution to the script.

43. On or about March 16, 2023, Campbell created the ESCALATOR CAST Facebook group chat with actors across the country, and added Plaintiff a few days later.

44. On or about April 2, 2023: (a) Plaintiff and Campbell signed an initial legal fee agreement (the "Fee Agreement"); and (b) Plaintiff began representing Campbell (Related Action, Docket No. 60-6 at 1).

45. On or about April 4, 2023, Campbell signed a letter of informed consent related to Plaintiff's status as an actor (Related Action, Docket No. 60-4 at 1).

46. On or about April 9, 2023, Plaintiff proofed *Last Door* and sent fixes and suggestions to Campbell and Willi.

47. On or about April 11, 2023, Campbell signed: (a) a contract to amend the copyright registration of *Obstacle* (TXu002290694) to remove James Eric Meyer (Related Action, Docket No. 92-2 at 1); and (b) an accompanying affidavit of sole authorship of *Obstacle* (Related Action, Docket No. 92-2 at 2).

48. On or about April 15, 2023, Campbell introduced Plaintiff to Defendant Piña, his talent manager.

49. On or about April 29, 2023, Plaintiff organized and led a first table read of *ESCALATOR Short*.

50. On or about May 4, 2023: (a) Campbell had a creative disagreement with Plaintiff and Willi over *Last Door*; and (b) Campbell became combative when they would not rewrite the script according to his view.

51. Campbell never made or documented the *Last Door* rewrite himself.

52. On or about May 15, 2023, Campbell asked Plaintiff to become a co-writer on *ESCALATOR Short*, *ESCALATOR Feature*, *Serene*, *Last Door*, and *Open House*.

53. On May 16, 2023, Campbell sent Plaintiff a copy of his talent representation agreement with RPMTA.

54. On or about May 21, 2023: (a) Campbell and Willi had a falling out; (b) Campbell tried to take away Willi's writing credit on *Serene* and *Last Door*; and (c) Plaintiff prevented it.

55. On or about May 28, 2023: (a) Plaintiff proofread *Money Tree* and provided at least 50 corrections and suggestions to Campbell and Esper; and (b) the title page of the version of *Money Tree* that Plaintiff received read: "THE MONEY TREE / Written by / William Campbell / & / Chris Esper."

56. Between June 1 and June 29, 2023, Plaintiff sent Campbell five writers' collaboration agreements for *ESCALATOR Short*, *ESCALATOR Feature*, *Serene*, *Last Door*, and *Open House* (the "Five Writers Agreements"), a second letter of informed consent regarding co-writing, and a legal services contingent contract (the "Contingent Contract").

57. On or about June 11, 2023, Plaintiff organized and led a second table read of *ESCALATOR Short*.

58. On July 11, 2023, between 1:08 p.m. and 1:14 p.m. ET: (a) Campbell viewed and signed via DocuSign eleven documents in a single envelope (the "DOCUMENTS"), including the Contingent Contract and the Five Writers Agreements; and (b) DocuSign sent him signed copies (Related Action, Docket No. 1-3 at 2; Docket No. 14-3 at 45; Docket No. 86-10 at 7–10).

59. In the Contingent Contract: (a) in paragraph 15, Campbell warranted that he was the only writer of *ESCALATOR Short*, *ESCALATOR Feature*, and *Obstacle*, and one of only two writers of *Serene*; and (b) in paragraph 16, he agreed to indemnify Plaintiff for any failure to disclose (Related Action, Docket No. 47-1 ¶¶ 15–16).

60. On July 11, 2023, at 2:08 p.m. ET, Plaintiff countersigned the Contingent Contract and emailed Campbell the fully executed copy.

61. On July 22, 2023, between about 10:00 p.m. and 11:00 p.m. ET, Campbell posted ten messages in the ESCALATOR CAST Facebook group chat, which had over 26 participants,

falsely declaring that Plaintiff was trying to "steal" his "first writer" position on the *ESCALATOR Short* writers' agreement (Related Action, Docket No. 37-7 ¶¶ 19–25).

62. On July 22, 2023, at 10:13 p.m. ET, Plaintiff texted Campbell that he had just seen the Facebook messages.

63. On July 22, 2023, Campbell falsely accused Plaintiff, via text message, of forging his signature on the contracts.

64. On July 22, 2023, at 11:35 p.m. ET, Plaintiff emailed Campbell twelve documents: the eleven DOCUMENTS as signed through DocuSign, including the Contingent Contract before Plaintiff's signature, and the fully executed Contingent Contract (Related Action, Docket No. 262-10, row 810 at 12).

65. On or about July 24, 2023, in the ESCALATOR CAST chat, Campbell: (a) again accused Plaintiff of trying to "steal" the project; and (b) threatened to sue collaborators who walked away.

66. After July 24, 2023, the director and lead actor, Glenn McBride, Jr., and most of the cast left the project (Related Action, McBride, Docket No. 37-7 ¶¶ 19–25).

67. On July 26, 2023: (a) Campbell forwarded Plaintiff's July 22, 2023 email, with all twelve documents, in separate emails to Sims (at 3:04 p.m.), Piña (at 8:40 p.m.), Esper (at 9:33 p.m.), and others; and (b) from that date, Sims, Piña, and Esper each possessed the executed Contingent Contract and the Five Writers Agreements.

68. On or about July 27, 2023, Campbell attended a Zoom meeting with a potential investor while intoxicated.

69. On or about July 27, 2023: (a) Campbell claimed that another attorney had registered copyrights in *ESCALATOR Short*, *ESCALATOR Feature*, *Serene*, *Last Door*, and *Open House*

without listing Plaintiff as an author; and (b) Plaintiff became aware of at least some of Campbell's misrepresentations.

70. On or about July 28, 2023: (a) Plaintiff contacted Gilligan and Das; and (b) they confirmed that they were writers of *ESCALATOR Short* (Related Action, Docket No. 37-2 ¶¶ 100–106; Docket No. 37-3 ¶¶ 51–53).

71. Between July 2023 and October 2023, Plaintiff's investigation: (a) took at least 50 unexpected hours; (b) included conversations with at least six undisclosed co-writers; and (c) revealed that Campbell had concealed co-writers of the PROJECTS in breach of his warranties, including Rennie and Fishbane on *ESCALATOR Feature*, and Mya Lien, Stephen Kessen, and Julianna McRae (writing as "Dawn DuVerger") on *Serene*.

72. Campbell later admitted that Rennie, Fishbane, Lien, Kessen, and McRae were co-writers (Related Action, Docket No. 117-1).

73. Campbell contributed no written expression to *Serene*, which Willi wrote based on Campbell's verbal creative input and McRae's script.

74. On or about July 31, 2023, Campbell failed to attend a meeting with a potential investor, without notice.

75. On or about August 2, 2023, Campbell failed to attend a meeting with a different potential investor, without notice.

76. In August 2023, Campbell engaged Levine as a composer for *Open House*.

77. On or about August 8, 2023, Plaintiff filed the copyright application for *Last Door*, which registered as Registration No. PAu004191778.

78. On or about August 14, 2023, Plaintiff informed Campbell that he would stop working with him unless Campbell disclosed the Contingent Contract to Sims and Michaels.

79. On or before August 15, 2023, in an email exchange (Related Action, Docket No. 75-5 at 2): (a) Plaintiff informed Sims and Brian Avery of the Contingent Contract and its encumbrance on all of the PROJECTS; (b) Campbell affirmed it; and (c) Sims's email was signed "agent/partner" of RPMTA.

80. On or about August 21, 2023, while Plaintiff was representing Campbell as his attorney and collaborating with him as a co-writer, Plaintiff and Campbell met with Levine online regarding *Open House* and other PROJECTS.

81. On or about August 27, 2023, Esper emailed Levine, with Plaintiff copied, a copy of the *Money Tree* screenplay bearing the title page crediting it as "Written by William Campbell & Chris Esper."

82. On or about September 2, 2023, Campbell again alleged, via text message, that Plaintiff had forged his signature on the DOCUMENTS.

83. On or about September 12, 2023, Campbell connected Plaintiff with Keough, a Massachusetts-based producer, to discuss the PROJECTS.

84. On or about September 12, 2023, a copy of *Last Door* bearing that date was "presented for shopping consideration" to Sims (Response of Jennifer Sims to Subpoena, Aff. ¶ 5.2 (March 30, 2026)).

85. In September 2023: (a) after multiple meetings, Keough was interested in deals for several PROJECTS, including *ESCALATOR Feature*, *Serene*, and *Last Door*; and (b) on September 22, 2023, Keough, as Executive Producer of Manny LLC, emailed Sims, with Silvia, Plaintiff, and Campbell copied, recapping "the meeting we just had," and stated that: (i) Campbell and Plaintiff would agree on "a number for a pre-option 'shopping' contract of 14 days to 30 days so Gary and I can go out and talk to some investors"; (ii) the goal was "a full

option contract on Escalator, one that would pay Gary and Billy before pre-production begins in earnest and keeps them on as the writers"; and (iii) Keough would provide Sims "anything you need to begin to promote the contract."

86. In September and October 2023, Keough discussed with Plaintiff engaging him as an attorney for Keough's upcoming projects.

87. On or about September 22, 2023, Campbell again alleged, via text message, that Plaintiff had forged his signature on the DOCUMENTS.

88. On or about September 25, 2023, Campbell admitted that Rennie and Fishbane were undisclosed co-writers of *ESCALATOR Feature*.

89. On or about September 26, 2023, Sims sent Campbell, with Plaintiff copied, a shopping agreement for *Money Tree*, *Last Door*, *ESCALATOR Feature*, *Serene*, *Obstacle*, and *WILBUR*, by an email signed "agent/partner" of RPMTA (Related Action, Docket No. 104-3 at 1; Docket No. 117-8).

90. On or about September 28, 2023, during a phone call: (a) Sims agreed to represent both Plaintiff and Campbell in shopping their collaborative screenplay works; (b) Sims agreed to represent Plaintiff as an actor; and (c) Sims withdrew that offer after Campbell objected.

91. On or about September 28, 2023, after the call with Sims: (a) Campbell was intoxicated and belligerent on a business call with Plaintiff and Dark Hoffman, a potential director for *Serene*; and (b) Hoffman declined to work with Campbell (Related Action, Hoffman, Docket No. 39).

92. On or about September 29, 2023: (a) Campbell and Plaintiff argued about Campbell's misrepresentations; and (b) Campbell pleaded with Plaintiff not to end the representation.

93. On or about October 1, 2023, Plaintiff met with Keough in person, and: (a) the two executed a non-disclosure agreement so that Plaintiff could be transparent about Campbell's misrepresentations of authorship; (b) Plaintiff explained that *ESCALATOR Feature* was not cleared; (c) Plaintiff stated that he would not enter into a shopping agreement for intellectual property he did not own; (d) Plaintiff asked to skip the planned shopping agreement and go directly to an option, for which Keough would pay $5,000, so that Plaintiff would have the money to buy out the undisclosed co-writers; (e) Keough agreed; (f) Keough promised Plaintiff that if Plaintiff cleared the other writers, the deal would go through; and (g) Keough told Plaintiff not to worry about Campbell.

94. From October 1 through October 12, 2023, Plaintiff and Keough communicated regularly about the deal.

95. From October 1 through October 10, 2023, Campbell was silent and could not be located.

96. On or about October 4, 2023, in reliance on Keough's promise: (a) Plaintiff began buying out the undisclosed co-writers of both *ESCALATOR* screenplays; (b) Plaintiff sent assignment agreements to Gilligan, Das, Rennie, and Fishbane; (c) Gilligan and Das assigned their copyrights in *ESCALATOR Short* to Plaintiff for $100 each; and (d) Rennie and Fishbane delayed (Related Action, Docket No. 37-2 ¶¶ 100–106; Docket No. 37-3 ¶¶ 51–53).

97. On October 5, 2023, at 6:02 p.m., in a recorded Zoom meeting with Plaintiff and Leanne Silvia ("Silvia"), Manny LLC's accounting manager, whom Keough has described as his "acquisitions partner" who "signs the checks," Keough, on behalf of Manny LLC, made what he called a "formal offer" to purchase *ESCALATOR Feature* outright from its co-writers, and stated that: (a) the purchase price was $50,000, payable as $5,000 up front and $45,000 the

day before pre-production; (b) the writers would also receive one-half point of all gross receipts in perpetuity and an additional one-quarter point for any extension of the intellectual property; (c) the writers would "keep the $50,000, whether we make the movie or not"; (d) he believed he could get the film made that year; and (e) after the purchase he would "enter into separate negotiations" regarding production roles for Plaintiff.

98. On October 5, 2023, Campbell was absent and out of contact.

99. Between October 4 and October 10, 2023, while buying out *ESCALATOR Feature*: (a) Plaintiff learned from Rennie and Fishbane that Campbell had written nothing in it; (b) Plaintiff told Keough; and (c) Plaintiff and Keough agreed that Campbell should be excluded from the deal completely.

100. On or about October 7, 2023, Keough promised Plaintiff that if Plaintiff got rid of all the other writers, Keough would: (a) get rid of Campbell; (b) pay Plaintiff $50,000 to purchase *ESCALATOR Feature*; (c) employ Plaintiff as the set writer during production; (d) assist Plaintiff in joining the Writers Guild of America; and (e) provide Plaintiff with 1% of gross profits.

101. On or about October 7, 2023, Keough informed Plaintiff that he had rented the former Sears store at the Solomon Pond Mall in Marlborough, Massachusetts as a filming location for *ESCALATOR Feature*.

102. On October 10, 2023: (a) in reliance on Keough's promises, Plaintiff acquired the copyrights of Rennie and Fishbane in *ESCALATOR Feature* for $2,000 (Related Action, Docket No. 38 ¶ 27; Docket No. 37-1 ¶ 26); and (b) Rennie's assignment states that he resides in Methuen, Massachusetts (Related Action, Docket No. 36-2).

103. On October 10, 2023: (a) Campbell resurfaced after being missing for ten days; (b) Campbell claimed he had been hospitalized with COVID; and (c) .

104. Campbell had been held in custody in Pennsylvania during that period (In re Campbell, No. 1:26-bk-11090-VK (Bankr. C.D. Cal.), Docket No. 80 at 63).

105. On October 10, 2023, Campbell acted as if his ten-day disappearance had not occurred.

106. Keough later described Campbell's ten-day disappearance as a serious "red flag."

107. On October 10, 2023: (a) Plaintiff emailed Sims, with Campbell, Esper, Willi, and Austin copied, following up on "the Shopping Agreements we discussed last week," identifying Esper as Campbell's co-writer on *Money Tree* and Willi and Plaintiff as Campbell's co-writers on *Last Door*, and copying them "so you can reach out to them directly"; and (b) Sims replied to all of them, over her "agent/partner" signature: "I will be sending out shopping agreements this week" (Related Action, Docket No. 117-9 at 1).

108. In October 2023, Sims was packaging *Money Tree* for production: (a) she sat in on meetings and discussions about the project; (b) she suggested two actors for it from her own client roster; and (c) she brought Letters of Intent dated October 11, 2023, from actors Jim Hanks and Mi Kwan Lock "to the writers" (Response of Jennifer Sims to Subpoena, Aff. ¶¶ 5.3, 6.3 (March 30, 2026)).

109. On October 11, 2023: (a) Plaintiff texted Keough that he had acquired the rest of the *ESCALATOR* intellectual property and asked whether Keough was "still on board" with Plaintiff telling Campbell that he was out of the project; (b) Keough replied that he preferred to discuss it by phone or Zoom, and that "[t]hen we can schedule a meeting with him and finish the deal"; and (c) that night, Keough and Plaintiff spoke by phone for nearly an hour.

110. On October 12, 2023: (a) from 10:00 a.m. to 11:56 a.m. ET, Plaintiff and Campbell spoke by phone; (b) during that call, Plaintiff informed Campbell that he had bought the *ESCALATOR* copyrights from Gilligan, Das, Rennie, and Fishbane (¶¶ 96, 102), and offered Campbell $2,500 for his claimed interest in *ESCALATOR Feature*; (c) Campbell refused, and protested when Plaintiff said he would rewrite Campbell out of the script; (d) Campbell then brought Piña into the call, and Plaintiff informed Piña of his copyright ownership and raised his offer to $5,000; and (e) Piña rejected it as not enough.

111. On October 12, 2023: (a) at 1:28 p.m. ET, Plaintiff informed Keough by text that Piña would join the October 13 meeting to represent Campbell's interests; (b) Keough replied, "Sure," and "I know of her"; (c) Keough stated that "[g]oing forward" he would need Silvia at every meeting because he "can't risk her not knowing all of the information"; and (d) by email to Plaintiff, Silvia, Campbell, and Piña, signed as "Executive Producer, Manny Jae Media LLC," Keough wrote, "I do look forward to trying to find a resolution," while reserving the right "with Leanne to withdraw our interest in the project entirely" if there was further arguing over email.

112. On October 12, 2023, at 1:39 p.m. ET, Plaintiff spoke by phone with Piña and Campbell for about six minutes.

113. On the morning of October 13, 2023, Plaintiff learned that Rennie had written *ESCALATOR Feature* from a blank page rather than by adapting *ESCALATOR Short*, using at most "a line here or a gag there" from it.

114. On the morning of October 13, 2023: (a) Plaintiff emailed Keough a summary of facts supporting the transaction and asked to speak with him before the meeting; and (b) Keough replied, "I am not available until the meeting. We will deal with it then!"

115. Between the October 12, 2023 messages and the October 13 Meeting, Keough did not discuss the substance of the deal with Plaintiff.

116. On information and belief, between the end of Plaintiff's call with Campbell and Piña at 11:56 a.m. ET on October 12, 2023, and the start of the October 13 Meeting, Piña, alone or with Campbell, communicated with Keough, Silvia, or both regarding Plaintiff, Campbell, or the transaction.

117. On October 13, 2023, at 4:00 p.m., Keough, Silvia, Campbell, Piña, and Plaintiff participated in a recorded Zoom meeting (the "October 13 Meeting") to discuss the *ESCALATOR Feature* transaction (Related Action, Docket No. 239-5 ("Tr.")).

118. At the October 13 Meeting: (a) Keough opened with what he called "a statement about where I'm at"; (b) after reviewing his offer, Keough announced, "After everything that I have observed and listened to and heard, but in particularly that these personal negotiations in the writers' agreement between the two of you have spilled over to me, I withdraw my offer"; (c) Keough later explained that he had withdrawn it "after speaking with my partner" (Tr. 01:19–01:27, 16:15–16:31, 20:24–20:31); and (d) that was the first time Plaintiff learned that Keough was withdrawing from the transaction.

119. At the October 13 Meeting, Keough also stated: (a) "Now, I'm not saying that I won't ever offer something or I don't want to buy the script"; (b) that "we're still open to the project"; and (c) that "our offer that we withdrew isn't gone" (Tr. 17:08–17:13, 40:35, 48:10).

120. At the October 13 Meeting: (a) Keough pressed Campbell to admit that Campbell had told Keough he was the sole writer of the screenplay; and (b) Campbell became defensive and combative (Tr. 23:23–24:41).

121. At the October 13 Meeting, in the presence of Keough, Silvia, Campbell, and Piña: (a) Plaintiff stated that Campbell had told him, only the weekend before their planned meeting with Keough to sign a shopping agreement, that *ESCALATOR Feature* had two other co-writers, Rennie and Fishbane, and that this was the first Plaintiff had heard of them (Tr. 29:56–30:13, 31:26–31:39); (b) Plaintiff stated that he had acquired the copyrights of Rennie and Fishbane and of the two co-writers of *ESCALATOR Short* (Tr. 30:28–30:46, 33:12–33:25); (c) Plaintiff recounted his October 1, 2023 agreement with Keough (Tr. 32:15–33:12); and (d) Keough did not dispute it.

122. At the October 13 Meeting, in front of Keough, Silvia, and Piña, Campbell told Plaintiff, "I didn't sign your contracts. I didn't trust you" (Tr. 34:10–34:12).

123. At the October 13 Meeting, Piña told Keough and Silvia: (a) "I think the smartest thing is to step away from dealing with these people"; (b) "You can do better than this, man. … Don't step in shit unless you have to. Don't surround yourself in slime unless you actually love slime"; and (c) "Gary and William will never work this out. This will never be worked out" (Tr. 49:53–50:07, 56:31–56:43, 57:01–57:13).

124. At the October 13 Meeting, Piña told Keough and Silvia that: (a) "Gary has some kind of ridiculous pretend … I'm not even going to call it an entertainment contract"; (b) it "actually says that when Gary brings in investors, he's going to get a percentage kickback and that should not be allowed"; (c) Campbell's signature on it "[d]oesn't look like his signature"; and (d) "the contract is a joke. It's four pages of a joke" (Tr. 52:26–52:53, 55:23–55:31).

125. At the October 13 Meeting: (a) Piña announced, "Nobody is producing this movie … I'm going to take it over and I'm going to give it to John and Leanne to do whatever the fuck they want to do with it," that is, for free; and (b) Piña added that "there's no point in going

forward with this piece of shit project when two little boys can't figure out whose penis is bigger," and then, "I'm going with you, John," and "And Leanne, I don't know what it looks like," lewd comments that visibly surprised Keough (Tr. 58:20–59:21).

126. At the October 13 Meeting, Silvia then stated, "we don't want to move forward if you guys aren't happily moving forward" (Tr. 1:01:42).

127. At the October 13 Meeting, Keough then stated, "I withdrew the offer. I'm going to, I, I heard Shelley loud and clear. I'm not, this is, this is not what I want to do. This is super negative and wrong" (Tr. 1:05:52–1:05:58).

128. At the October 13 Meeting, Keough added, "you haven't done wrong by me because nothing's happened here. We haven't done anything" (Tr. 1:06:05–1:06:10).

129. On information and belief, that statement was false: Keough had already committed money to the production, including by renting the former Sears store at the Solomon Pond Mall.

130. At the October 13 Meeting, Keough closed by stating, "as far as this project is concerned, we're out" (Tr. 1:08:46).

131. At the October 13 Meeting, Piña then: (a) demanded that Plaintiff and Campbell "divorce each other, never call each other, never text each other"; (b) stated, without identifying anything, that there were things "untrue in the agreement that I saw that the attorney also known as Gary wrote"; and (c) stated that "no one will be making this piece of shit project" (Tr. 1:09:02–1:09:40).

132. On October 13, 2023, at 5:20 p.m. ET, Plaintiff began a 33-minute call with Campbell and Piña, during which: (a) Campbell and Piña demanded $7,500 for Campbell's purported ownership interest in *ESCALATOR Feature*; and (b) Piña assured Plaintiff that she could get Keough to close the deal if Plaintiff paid Campbell.

133. On October 13, 2023, during that call, Plaintiff and Keough exchanged text messages in which: (a) at 5:43 p.m. ET, Plaintiff wrote, "Hi John. I'm on the phone with Billy and Shelley. We're reaching a deal. If I buy Billy out, are you still willing to pick up the script?"; (b) at 5:47 p.m. ET, Keough replied, "At this point after today Leanne is out, and wants a break from this piece. We will need some time before we look at it again. Not saying no, but saying not right now."; (c) at 5:48 p.m. ET, Plaintiff wrote, "John, I am literally on the phone with them right now. I've already got $2,200 into this, based on our agreement. And I'm ready to buy him out because you said you would pick up the script if there is a single author and all the drama is gone. Please tell me right now if you want the script or not. If you don't, I'll end the call I'm on right now."; (d) at 5:50 p.m. ET, Plaintiff wrote, "They want $7,500 to buy them out right now. I need to know."; (e) at 5:50 p.m. ET, Keough replied, "The drama isn't gone. It's been 40 minutes. Asking me this right now makes no sense to me. We are out as of right now."; (f) at 5:53 p.m. ET, Plaintiff asked, "Can we have a conversation by phone please?"; (g) at 5:55 p.m. ET, Keough replied, "Not today. Right now even asking me that after what just happened is a big red flag. Please value my time."; and (h) at 5:56 p.m. ET, Plaintiff replied, "I do value your time, John. Enjoy your weekend."

134. On October 13, 2023, at 6:30 p.m. ET, Plaintiff and Piña spoke by phone for about four minutes.

135. On or after October 13, 2023, Plaintiff asked Piña to put in writing, as a term of any agreement to buy Campbell's claimed interest in *ESCALATOR Feature*, her assurance that she could get Keough to close the transaction if Plaintiff paid Campbell. Piña refused.

136. On October 14, 2023, Campbell forwarded Plaintiff a revised version of Sims's shopping agreement, still dated September 20, 2023, that: (a) covered only *Money Tree, Last*

*Door*, and *WILBUR*; (b) was identical to the version Sims sent on September 26, 2023, except that it omitted *ESCALATOR Feature*, *Serene*, and *Obstacle*; and (c) like the original, was for Campbell alone and did not name Plaintiff.

137. On information and belief, Sims prepared the revised agreement after the October 13 Meeting and sent it to Campbell alone.

138. On October 14, 2023, Campbell registered the *ESCALATOR Feature* solely in his name with the Writers Guild of America (WGA East Reg. No. I366235; Related Action, Docket No. 117-4 at 9).

139. On or about October 17, 2023, Plaintiff emailed Campbell, Jeffrey Rosenberg (a co-writer of *Open House*), and Levine offering to draft a new writers' agreement for *Open House* (Related Action, Docket No. 117-4 at 13, 23–24).

140. On or about October 18, 2023, after further inquiries by Plaintiff regarding the promised shopping agreements, Sims replied, over her "agent/partner" signature, "William and I are in direct contact regarding shopping agreements" (Related Action, Docket No. 117-9 at 3).

141. After October 18, 2023, Sims: (a) ceased substantive communication with Plaintiff regarding the shopping agreements and the shopping of the PROJECTS; and (b) never provided Plaintiff, Esper, or Willi with the promised shopping agreements.

142. Sims's October 18, 2023 email was the first indication to Plaintiff that Sims would not send him the promised shopping agreement and would instead deal with Campbell alone.

143. Beginning on or about October 22, 2023: (a) Campbell proposed a mutual parting of ways; and (b) Austin mediated between Plaintiff and Campbell for over two weeks.

144. On or about November 6, 2023, at Campbell's request, Plaintiff provided Campbell an itemized invoice for 906.5 documented hours of legal services.

145. On November 6, 2023, Campbell told Plaintiff by phone that Sims had received multiple anonymous calls and voicemail messages, and implied that Plaintiff had made them.

146. On November 7, 2023, Plaintiff emailed Sims, with Campbell and Austin copied, that the calls were not from him.

147. On information and belief, by November 9, 2023, *Money Tree* had reached the second stage of funding through Michaels and was nearing production.

148. On November 9, 2023, Campbell terminated Plaintiff's legal representation, without compensation, by a letter from Attorney Dan Cardinal.

149. On information and belief, Piña, Sims, or both urged Campbell to terminate Plaintiff's legal representation.

150. On information and belief, Piña, Sims, or both paid for Cardinal's services.

151. On or about November 10, 2023: (a) Plaintiff retained Massachusetts-based Attorney Philip R. Gindi in a limited capacity; (b) Gindi responded to Cardinal's letter; and (c) Cardinal replied that he no longer represented Campbell.

152. On November 14, 2023, Austin informed Plaintiff that he would resume mediating between Plaintiff and Campbell.

153. On November 21, 2023, Austin informed Plaintiff that he would resume the mediation after the Thanksgiving holiday.

154. On November 21, 2023, at about 2:41 p.m.: (a) Campbell placed a call to Gindi with Piña on the line; (b) Campbell remained silent while Piña, hostile, disparaged Plaintiff; and (c) Gindi asked Piña to put her complaints in writing and ended the call.

155. On November 22, 2023, Campbell filed a complaint with the Clarion Borough Police Department in Clarion County, Pennsylvania, alleging that Plaintiff had threatened him (Report No. 2023-1713).

156. On November 23, 2023, Thanksgiving Day, Officer O'Neil of the Clarion Borough Police Department called Plaintiff regarding Campbell's complaint.

157. On November 24, 2023, Piña left Gindi two voicemail messages asking him to call her regarding Plaintiff.

158. On November 25, 2023, Piña left Gindi two voicemail messages stating that: (a) "the police are aware of Gary Bloom's threats"; (b) her "clients do not appreciate at all being threatened that something will happen to them and that Gary is going to send people after them"; and (c) Plaintiff was not to communicate with "William Campbell, Andrew Austin, and the others."

159. On November 27, 2023, Piña left Gindi two voicemail messages: (a) in the first, she asked "how many times someone can get a phone call on their phone and be threatened and told that you will die and that they will get your mother and your cat," and stated: "I've already reported him to the Bar in Massachusetts. I've reported him to the Screen Actors Guild because he's a pretend actor, and the police are very aware in Massachusetts and in Pennsylvania about Mr. Bloom's actions"; and (b) in the second, she stated that Plaintiff "has been reported to the police in Pennsylvania and Massachusetts" and "to the Bar Association."

160. On November 27, 2023, after Plaintiff updated Austin, Austin replied that Plaintiff should speak with Piña.

161. On November 28, 2023, Plaintiff spoke by phone with Clarion Borough Chief of Police Peck, who told Plaintiff that: (a) Campbell's complaint alleged that Plaintiff had made death

threats against Campbell, his mother, and their cat; and (b) the complaint had been closed as unsubstantiated.

162. On November 28, 2023, Plaintiff requested the records of Campbell's complaint from Clarion Borough under Pennsylvania's Right-to-Know Law.

163. On December 2, 2023, Sims replied to Plaintiff by email: "Thank you, Gary. My phone issue has been resolved."

164. On December 5, 2023, Piña left Gindi two voicemail messages stating that: (a) she wished to "discuss his offer from his client, Gary Bloom, to my client, William Campbell"; (b) Campbell "had to leave his home, take his family and leave his home, because of the threats" Plaintiff made; (c) she was "in very close communication with the Massachusetts Board"; and (d) "if I do not get a call back from you by the end of this week, we're going to have some fun."

165. On December 5, 2023: (a) Plaintiff emailed Chief Peck, Officer O'Neil, and Detective Wright asking whether any further complaints had been filed against him; and (b) Plaintiff was unable to sleep until 5:00 a.m.

166. On December 5, 2023, Clarion Borough denied Plaintiff's request on the ground that the records "relate to or resulted in a criminal investigation."

167. On December 6, 2023: (a) Piña left Gindi a voicemail message stating, "Okie dokie, now we're going to have some fun with your attorney license"; and (b) Piña left Gindi a negative review (1 out of 5 stars) on Avvo.

168. Gindi later had Piña's Avvo review removed for violating Avvo's terms of service.

169. On December 6, 2023: (a) Plaintiff called Chief Peck, who told him no further complaints had been filed; and (b) Chief Peck informed Plaintiff by email that "Report

# 2023-1713 involving Mr. Campbell is unfounded and closed," and that "[n]o other reports involving you have been filed with the Clarion Borough Police Dept."

170. On December 6, 2023: (a) Plaintiff emailed Piña a settlement offer and offered to draft a settlement agreement; and (b) Piña replied that the offer was "absurd" and that Plaintiff's agreements were "a joke."

171. On December 7, 2023, Piña left Gindi two voicemail messages: (a) in the first, she suggested he "look at [his] reviews online," stated that she had "just got[ten] off the phone with the Massachusetts Board" and that "it would be in your best interest, if you are still representing Gary M. Bloom, to give me a call," and added, "Even though we all know you're a pretend lawyer, because otherwise you would have called me back. This is the ninth time that I'm calling you. Have fun!"; and (b) three minutes later, in the second, she again stated that she had "just got[ten] off the phone with the Massachusetts Board," that "we believe it would be in your best interest to give me a call back," and that "we all agree that it would be in your best interest to contact me."

172. On December 7, 2023: (a) Gindi sought a harassment prevention order against Piña, which was marked for hearing; and (b) Plaintiff sought a harassment prevention order against Piña, which was denied.

173. Plaintiff never threatened Campbell or his family.

174. On or about December 22, 2023, Plaintiff emailed Campbell asserting a financial interest in all of the PROJECTS and property rights in five screenplays based on "co-writing agreements and work product" (Related Action, Docket No. 117-4 at 20).

175. On January 4, 2024, after a hearing, the court denied Gindi's application for a harassment prevention order against Piña.

176. On or about January 12, 2024, Plaintiff learned that Lien is not a true author of *Serene*.

177. Between January 26 and January 31, 2024, Plaintiff: (a) acquired the copyright of McRae in *Serene* on January 29; (b) acquired the copyright of Willi in *Serene* on January 31 (Related Action, Docket No. 37-4 ¶ 18); and (c) registered *ESCALATOR Short* (Registration No. PA0002454810), *ESCALATOR Feature* (Registration No. PAu004211360), and *Serene* (Registration No. PAu004213773).

178. On February 3, 2024, in a recorded Zoom meeting to discuss settlement of Plaintiff's claims against Campbell, Piña: (a) asked Plaintiff, "How's your acting career going?"; (b) told him, "we have no problem with you taking over *Escalator* and *Serene*," and "we're willing to have you purchase them for very minimal rate"; and (c) stated that "the other projects actually have people interested in them, thanks to me," and "I've got other people who are willing and interested in optioning these other projects," referring to *Money Tree*, *Last Door*, and others.

179. On information and belief, the persons Piña described as interested in optioning *Money Tree* and *Last Door* received and read copies of those screenplays, which Piña or Campbell provided to them without Plaintiff's knowledge or authorization.

180. On February 12, 2024, Plaintiff filed the Related Action.

181. Between February 12 and March 15, 2024: (a) Campbell emailed Rosenberg that he had "friends in law enforcement" and was seeking to have Plaintiff charged "with felony extortion" over what Rosenberg considered a "contract dispute"; and (b) Rosenberg then terminated his relationship with Campbell (Related Action, Rosenberg, Docket No. 207-1 ¶¶ 26–34).

182. On February 16, 2024, Gindi emailed Sims, with Plaintiff copied: (a) notice that the Related Action had been filed and that "some of those properties are encumbered by the lawsuit and their disposition will be decided by the Court," identifying *The Last Door*, *The Money*

*Tree*, *See You Later*, *Escalator*, *Serene*, *Wilbur the Whompin' Wallaby*, *The Obstacle*, *Open House*, and *Cat-Astrophe*; (b) a demand that Sims "cease and desist from any and all activity related to the above encumbered properties until the Court resolves the matter"; and (c) a request for "a current status of any activity related to the encumbered properties."

183. Sims never replied or provided any status information.

184. On February 27, 2024, Campbell was served by alternative service (Related Action, Docket No. 6).

185. On March 1, 2024, Plaintiff filed his First Amended Complaint in the Related Action (Related Action, Docket No. 10).

186. On March 12, 2024, Campbell filed a letter (dated March 4, 2024) in the Related Action: (a) stating that he had given *Money Tree* to Esper and *WILBUR* to Marc Bode; (b) accusing Plaintiff of "blackmail" and "extortion" (Related Action, Campbell, Docket No. 14); and (c) accompanied by a confirmatory letter from Esper stating that Esper was the "sole owner" of *Money Tree* (Related Action, Esper, Docket No. 14-1 at 1).

187. On March 13, 2024: (a) Rennie forwarded Plaintiff the September 17–18, 2021 email chain among Campbell, Fishbane, Rennie, and Piña; and (b) Plaintiff then first learned that Piña had known, before the October 13 Meeting, that Campbell held no ownership interest in *ESCALATOR Feature*, and that she had sought an "offer" for Campbell from its actual writers.

188. On March 15 and 16, 2024, Rennie, Fishbane, Willi, and Rosenberg signed affidavits concerning their authorship of *ESCALATOR Feature*, *Serene*, *Last Door*, and *Open House*.

189. On March 18, 2024, Sims attended a Zoom hearing in the Related Action on Plaintiff's motion for a temporary restraining order, in support of Campbell.

190. On May 8, 2024, Plaintiff filed the March 15 and 16, 2024 affidavits in the Related Action (Related Action, Rennie, Docket No. 38; Fishbane, Docket No. 37-1; Willi, Docket No. 37-5 (superseded by Docket No. 207-2); Rosenberg, Docket No. 37-6 (superseded by Docket No. 207-1)).

191. In August 2024, Esper emailed Campbell and Sims: "Unfortunately, my decision remains the same to have my name removed."

192. On or about September 8, 2024: (a) Plaintiff met Esper at a film event in Arlington, Massachusetts; (b) Esper told Plaintiff that he had written 90% of *Money Tree*; and (c) Esper told Plaintiff that Sims was no longer working with Campbell (Related Action, Docket No. 196 ¶¶ 2–3).

193. On September 12, 2024, according to its metadata, a 95-page version of *Money Tree* titled "The-Money-Tree-WJC & ML v3.pdf" was created (the "2024 Version"), which: (a) bears a title page reading "THE MONEY TREE / Written by / William James Campbell III / Polish by / Michael A. Levine / Copyright 2023"; and (b) reproduces verbatim approximately 90% of the May 31, 2023 Campbell-Esper draft ("230531_THE MONEY TREE_10TH DRAFT"), whose title page credits Campbell and Esper as its writers.

194. On November 3, 2024, the domain powerfulstorylines.com was registered for a one-year term, more than eight months before Powerful LLC was formed.

195. On January 1, March 1, and July 13, 2025, the Internet Archive's Wayback Machine crawled powerfulstorylines.com.

196. On information and belief, one or more of Levine, Campbell, Sims, and Avery registered the domain in preparation for marketing the PROJECTS.

197. On November 14, 2024, Plaintiff emailed Sims to reconnect, and Sims did not respond (Related Action, Docket No. 86-5 at 21; Docket No. 196 ¶ 4).

198. On or about February 26, 2025: (a) Campbell emailed Esper demanding to know why Esper had told Plaintiff that Sims was no longer working with Campbell, and calling Plaintiff "a fool and fraud"; and (b) Esper responded, regarding *Money Tree*, "I don't work for him and he shouldn't be saying its his and mine. It was ours" (Related Action, Docket No. 117-4 at 25; Docket No. 196 ¶ 5).

199. On March 31, 2025, Campbell produced his Rule 26 initial disclosures (Related Action, Docket No. 92-8), which omitted: (a) Levine; and (b) Michaels.

200. On June 6, 2025, Campbell produced his first responses to requests for admission and interrogatories (Related Action, RFAs, Docket No. 86-3; ROGs, Docket No. 86-4), and on June 20, 2025, he produced his first documents (Related Action, RFPs, Docket No. 86-5). In those responses and that production, Campbell: (a) referred to Levine only as a "writer and/or composer on *Open House*"; (b) did not identify Michaels, but produced one email referencing a meeting with Michaels and his team (Related Action, Docket No. 86-5 at 15); and (c) did not disclose or produce his talent representation agreement with RPMTA.

201. On information and belief, Campbell produced the email referencing Michaels inadvertently.

202. On or about July 13, 2025, Campbell, Sims, Levine, and Avery formed Powerful LLC, a New Mexico limited liability company, with Levine as its Organizer.

203. In September 2025, when Plaintiff first viewed the LLC's website at powerfulstorylines.com, the website: (a) was actively marketing *Money Tree*, *WILBUR*, and *Cat-Astrophe*; (b) credited *Money Tree* as "WRITTEN BY WILLIAM JAMES CAMPBELL"

and listed Campbell as the sole writer of these works; and (c) also marketed some of Levine's own creative works alongside these three PROJECTS.

204. On information and belief, one or more of Levine, Campbell, Sims, and Avery arranged for *Money Tree, WILBUR*, and *Cat-Astrophe* to be marketed on the LLC's website.

205. In September 2025, when Plaintiff viewed Powerful LLC's website, it was not marketing any of the six PROJECTS whose ownership Plaintiff had placed in dispute: the five PROJECTS subject to the Five Writers Agreements which Campbell denied signing, and *Obstacle*, whose registration Plaintiff had moved to invalidate in the Related Action.

206. In the entertainment industry, a party interested in a screenplay marketed for sale or option customarily signs a non-disclosure agreement and then receives a copy of the screenplay, typically by email.

207. Campbell had a documented practice of emailing copies of screenplays to prospective collaborators, investors, and producers.

208. Sims received copies of *Money Tree* and *Last Door* in that manner.

209. On information and belief, during the marketing of *Money Tree* through powerfulstorylines.com, from no later than September 2025 and as early as November 2024, through November 2025, Powerful LLC and its members or agents emailed copies of the *Money Tree* screenplay, including the 2024 Version, to parties who expressed interest, each copy bearing a title page crediting Campbell alone as writer.

210. On August 11, 2025, Campbell filed a letter in the Related Action stating that Plaintiff "had flown from Boston to California creating a harassing stalking like behavior" at the office of "my agent[]," whose "name is Jennifer Sims," at "2600 Olive in Burbank"; that Plaintiff had been "aggressive and demonstrative … towards administrative staff, front desk, the owner of

the agency, [and] security"; and that "[m]y agent is gathering documents" (Related Action, Docket No. 91).

211. Plaintiff has never been to 2600 W. Olive Ave., Burbank, California.

212. On information and belief, none of Sims, Richer, Piña, or any staff or security personnel at 2600 W. Olive Ave. has ever seen Plaintiff there.

213. On information and belief, Campbell filed the August 11, 2025 letter to deter Plaintiff from pursuing Sims and to shield Sims and Powerful LLC from discovery.

214. On August 22, 2025, Plaintiff served subpoenas on Sims and Piña in the Related Action, including for records concerning the incident described in Campbell's August 11, 2025 letter.

215. On September 6, 2025, in a court-ordered discovery response supplement, Campbell: (a) first admitted signing the Contingent Contract; and (b) continued denying signing any other documents (Related Action, Docket Nos. 117-1, 117-2, 117-3, 117-4).

216. On September 6, 2025, in that supplement, Campbell: (a) disclosed the existence of an LLC involving himself, Sims, and Levine; (b) described Levine as his "composer/cowriter/LLC partner" on "all projects" over a two-year relationship on "good terms"; and (c) identified Esper as "Co-Owner (50%)" of *Money Tree* (Related Action, Docket Nos. 117-1 at 1, 117-2).

217. Through Campbell's September 6, 2025 supplement: (a) Plaintiff learned that Sims was still working with Campbell; and (b) Plaintiff was able to identify the LLC as Powerful LLC.

218. In September 2025, Plaintiff captured screenshots of the Powerful LLC website, which are true and correct depictions of the site as it then existed.

219. On October 2, 2025, Plaintiff served Esper with a subpoena in the Related Action (Related Action, Docket No. 196 ¶ 8).

220. On October 4, 2025, Plaintiff filed a Notice of Noncompliance regarding the failure of both Sims and Piña to respond to his subpoena (Related Action, Docket No. 131).

221. On October 6, 2025, Campbell called Plaintiff ex parte (Related Action, Docket No. 135).

222. On October 10, 2025, Esper responded to the subpoena, stating that: (a) he was not aware that *Money Tree* was listed on powerfulstorylines.com as written solely by Campbell or that it was being marketed by an LLC Campbell formed with Sims and two others; (b) he never signed any agreement allowing Campbell to assume sole authorship or ownership; (c) Sims never approached him about a shopping agreement; (d) Sims came into the project "to provide guidance in how to cast it, get it made, and potential clients of her roster who may be interested," and she got Letters of Intent from those actors; and (e) he resides in Foxboro, Massachusetts (Related Action, Docket No. 196-3 at 1).

223. On October 13, October 17, and October 20, 2025, Plaintiff conferred with Campbell's counsel in the Related Action regarding, among other things, *Money Tree* and Plaintiff's planned motion to join Sims, Powerful LLC, and others as defendants.

224. On information and belief, Campbell's counsel informed Campbell of Plaintiff's planned joinder, and Campbell informed his co-members of Powerful LLC.

225. On October 17, 2025, for $10, Esper executed a written assignment to Plaintiff that: (a) describes *Money Tree* as "a feature-length screenplay written by Assignor in collaboration with William James Campbell III (the 'Work') and later fully assigned to Assignor by Campbell"; and (b) assigns to Plaintiff "all of Assignor's right, title, and interest" in the Work, including all registrations of the Work, "damages for past or future infringements and

misappropriations," and the "right to sue for past, present, and future infringements and misappropriations" of the Work (Related Action, Docket No. 155-1).

226. On October 17, 2025, Sims called Plaintiff, made multiple statements, and repeatedly asked "Why are you targeting me?" and, when Plaintiff asked about the incident described in Campbell's August 11, 2025 letter, stated that it involved Piña, not Sims (Related Action, Docket No. 145).

227. On October 24, 2025, Eris Talent Agency, Plaintiff's voice talent agency, notified Plaintiff that it was terminating its representation of him.

228. On information and belief, either Sims (a voice talent agent) or Piña (a talent manager who had mocked Plaintiff's acting career) contacted Eris Talent Agency and caused it to terminate Plaintiff.

229. On or about November 3, 2025: (a) Plaintiff discovered that Powerful LLC's website was no longer active and understood that it had been taken down; and (b) that night, Plaintiff emailed Sims, Levine, and Campbell (through counsel) notice of his intent to join them and Powerful LLC as defendants in the Related Action.

230. Since November 3, 2025, the website has remained inactive.

231. On or about November 3, 2025, Plaintiff sent written demands for relief under M.G.L. c. 93A to Piña, Keough, Manny LLC, Sims, RPMTA, and Powerful LLC, identifying Plaintiff as the claimant and describing the unfair or deceptive acts and the injuries suffered.

232. As of December 3, 2025, RPMTA's website listed Sims's title as "PARTNER/AGENT" and her biography text described her as a "Partner/Agent" at RPMTA (Related Action, Docket No. 233-5 at 3).

233. On December 2, 2025, Sims, RPMTA (by Richer), and Powerful LLC (by Levine) each responded in writing to Plaintiff's demand, denying all liability and tendering no settlement (Related Action, Docket No. 262-1 at 5–18).

234. Piña, Keough, and Manny LLC never responded to Plaintiff's demands.

235. On December 30, 2025, Plaintiff moved for leave to file a Second Amended Complaint joining Sims, RPMTA, Piña, Keough, Manny LLC, and Powerful LLC as defendants in the Related Action (Related Action, Docket No. 177).

236. On January 30 and February 1, 2026, Rosenberg and Willi signed amended affidavits, which Plaintiff filed in the Related Action on February 1, 2026, in which: (a) Rosenberg affirmed that he had signed a three-way writers' agreement with Campbell and Plaintiff for *Open House*; and (b) Willi affirmed that she had signed three-way writers' agreements with Campbell and Plaintiff for *Last Door* and *Serene* (Related Action, Rosenberg, Docket No. 207-1; Willi, Docket No. 207-2).

237. On January 31, 2026, Willi informed Plaintiff by email that she did not remember Sims and did not remember any shopping agreement being sent to her.

238. On February 1, 2026, Willi informed Plaintiff by email that the only email she found regarding Sims was Plaintiff's October 10, 2023 email on which she had been copied, and that she did not believe she had any direct emails from Sims.

239. By February 10, 2026, after Sims was served with Plaintiff's motion to join her: (a) RPMTA's website had changed her title to "EXECUTIVE/AGENT"; and (b) her biography continued to describe her as a "Partner/Agent" at RPMTA (Related Action, Docket No. .233-6 at 3)

240. On March 19, 2026, the operative documents of Powerful LLC were amended to remove Sims and Avery as members, leaving Campbell and Levine as its only remaining members, each with a 50% membership interest.

241. On April 1, 2026, through counsel, Sims produced documents in response to Plaintiff's August 22, 2025 subpoena.

242. On April 1, 2026, in that agreed, narrowed first production, Sims: (a) produced the 2024 Version of *Money Tree*; (b) produced twelve documents Campbell had forwarded to her on July 26, 2023, including the fully executed Contingent Contract and Five Writers Agreements; (c) did not produce the email by which Campbell forwarded those documents; (d) regarding the incident described in Campbell's August 11, 2025 letter, produced only three screenshots of chat messages with Campbell, two of which show a single exchange, without the surrounding conversation, and no emails; and (e) served no privilege log (Response of Jennifer Sims to Subpoena, Aff. ¶¶ 5.3, 8 (March 30, 2026)).

243. On April 1, 2026, Plaintiff demanded that Sims produce the emails by which she received those documents.

244. Sims has not produced those emails, and her production remains incomplete.

245. On April 3, 2026, the Court denied Plaintiff's motion for leave to amend (Related Action, Docket No. 255).

246. On May 4, 2026: (a) Sims swore that since January 2014 she has continuously provided "talent representation services for the Talent Agency" (Related Action, Docket No. 276-3 ¶¶ 4, 7–8); and (b) Richer swore that RPMTA is her sole proprietorship (Related Action, Docket No. 276-4 ¶¶ 6–7).

247. On May 20, 2026, Campbell filed a Chapter 13 bankruptcy petition in the Central District of California, automatically staying the Related Action as to Campbell, the sole defendant.

248. On or about June 12, 2026: (a) Levine provided $3,500 toward a $7,000 payment to Campbell's bankruptcy counsel; and (b) Levine held a 50% membership interest in Powerful LLC.

249. On or about June 17, 2026, Campbell filed bankruptcy schedules listing the PROJECTS as his assets, subject to the ownership claims of Plaintiff in the Related Action.

250. Campbell's bankruptcy schedules omitted: (a) the competing ownership interests of Esper in *Money Tree*, Willi in *Last Door* and *Serene*, Rosenberg in *Open House*, and Meyer, Gregory Corner, and the late Buddy Howard (through his estate) in *Obstacle*; and (b) all the executory contracts of the Related Action, including the Five Writers Agreements and the *Obstacle* production agreement with Meyer and Leanne Johnson, as well as Campbell's representation agreement with RPMTA (In re Campbell, Docket Nos. 20, 80).

251. On or about July 1, 2026, Campbell and his mother, Patricia Campbell, flew from California to Pennsylvania.

252. On July 8 and July 22, 2026, Sims attended hearings on confirmation of Campbell's Chapter 13 plan.

253. On August 5, 2026: (a) Campbell amended his bankruptcy schedules to disclose his 50% membership interest in Powerful LLC at a value of $0.00; (b) Campbell stated that Powerful LLC "has no operations, nor does it own any assets"; and (c) Campbell did not mention Powerful LLC's prior commercial marketing of three of the PROJECTS and some of Levine's works.

254. On September 15, 2026, Sims attended the hearing on the motion to dismiss Campbell's bankruptcy case.

255. On October 12, 2026, Plaintiff learned from WhoIsFreaks.com and the Wayback Machine: (a) the registration and crawl dates alleged above; and (b) that the registration of powerfulstorylines.com had expired without renewal on November 3, 2025, rather than the website having been taken down.

256. Sims knew, while Powerful LLC marketed *Money Tree*, that Campbell was not its sole writer or owner, that Esper was a primary writer, and that Plaintiff claimed ownership and financial interests in the PROJECTS, based on: (a) her receipt from Campbell on July 26, 2023 of the executed Contingent Contract and Five Writers Agreements; (b) Plaintiff's August 2023 notice of the Contingent Contract; (c) Plaintiff's October 2023 correspondence with Sims regarding shopping agreements for Campbell's co-writers, including Esper as a co-author of *Money Tree*; (d) her bringing Letters of Intent for *Money Tree* "to the writers"; (e) Gindi's February 16, 2024 notice and cease-and-desist demand; (f) her attendance at the March 18, 2024 hearing in the Related Action in support of Campbell; and (g) Esper's August 2024 email to Campbell and Sims concerning *Money Tree*.

257. Levine likewise knew, while Powerful LLC marketed *Money Tree*, that Campbell was not its sole writer or owner, that Esper was a primary writer, and that Plaintiff claimed ownership and financial interests in the PROJECTS, based on: (a) Esper's August 27, 2023 transmission to Levine of the *Money Tree* screenplay crediting Esper as co-author; (b) Levine's 2023 meeting and correspondence with Plaintiff concerning the PROJECTS; (c) Levine's two-year collaboration with Campbell on "all projects," during which Campbell also continued to work with Esper on *Money Tree*; (d) the formation of Powerful LLC, with Levine as its

Organizer, during the pendency of the Related Action concerning the PROJECTS; (e) the knowledge of his co-members, including Campbell, who identified Esper in discovery as a co-owner of *Money Tree* during the marketing period, and Sims, who acknowledged Esper's authorship but excluded him from shopping agreements; and (f) the marketing of Levine's own works on the same website.

258. The prior knowledge of Campbell, Sims, and Levine, acquired before and while acting for Powerful LLC, is attributable to Powerful LLC.

259. Campbell has taken inconsistent positions on the ownership of *Money Tree*: (a) on March 12, 2024, he represented to this Court that he had transferred all his rights to Esper; (b) in September 2025, in discovery, he identified Esper as "Co-Owner (50%)" (Related Action, Docket No. 117-1 at 1); and (c) in October 2025, he marketed *Money Tree* through Powerful LLC's website with himself listed as the sole writer.

**COUNT I: FRAUD**

260. Plaintiff incorporates by reference all prior allegations relevant to this Count.

**A. Against Piña**

261. No later than September 18, 2021: (a) Piña knew that Rennie and Fishbane had written *ESCALATOR Feature*, that Campbell had no written agreement with them, and that Campbell held no ownership interest in it; and (b) she had nonetheless solicited an "offer" from them for Campbell's claimed interest (¶¶ 28–31).

262. On October 13, 2023, on the call described in ¶ 132, Piña represented to Plaintiff that: (a) Campbell held an ownership interest in *ESCALATOR Feature* that he could sell to Plaintiff for $7,500; and (b) she could get Keough to close the deal if Plaintiff paid Campbell.

263. Both representations were false, and Piña knew they were false. Campbell held no interest in *ESCALATOR Feature*. Less than an hour earlier, at the October 13 Meeting, Piña had heard Keough withdraw his offer and say "we're out" (¶¶ 127, 130). While Piña was claiming on the call that she could get the deal back, Plaintiff texted Keough, and Keough declined (¶ 133). When Plaintiff asked Piña to put her assurance in writing as a term of any agreement, Piña refused (¶ 135).

264. On February 3, 2024, Piña offered to sell Plaintiff Campbell's purported interests in *ESCALATOR Feature* and *Serene* "for very minimal rate" (¶ 178). Piña knew that Campbell held no interest in *ESCALATOR Feature* and that Plaintiff had already acquired the interests of its actual writers (¶¶ 110, 121).

265. Piña made these representations intending that Plaintiff pay Campbell for rights Campbell did not hold and abandon his own ownership claims.

266. Plaintiff reasonably relied on Piña's October 13, 2023 assurance that she could get Keough to close the transaction if Plaintiff paid Campbell. Plaintiff's reliance was reasonable because: (a) at the October 13 Meeting, in Plaintiff's and Piña's presence, Keough had stated that "we're still open to the project" and that "our offer that we withdrew isn't gone" (¶ 119); (b) Keough had conditioned the transaction on a single author and the end of "the drama" (¶ 133(c)); and (c) Piña's proposal, that Plaintiff buy out Campbell's claimed interest, would have met that condition. In reliance on Piña's assurance, Plaintiff: (d) stayed on the call to negotiate the buyout; (e) texted Keough that he was "ready to buy him out" and asked him to confirm that he would complete the transaction if Plaintiff bought Campbell out (¶ 133(a), (c)–(d)); and (f) continued to negotiate with Piña in a further call at 6:30 p.m. ET and afterward,

until she ultimately refused to put her assurance in writing (¶¶ 134–135). All of that time was wasted because Piña's assurance was false.

267. As a direct and proximate result of Piña's fraudulent misrepresentations, Plaintiff has suffered damages in an amount to be determined at trial.

**B. Against Keough and Manny LLC**

268. On October 1 and October 7, 2023, Keough, on behalf of himself and Manny LLC, promised to purchase *ESCALATOR Feature* once Plaintiff cleared the other writers, and represented that he had rented a filming location for it (¶¶ 93, 100–101).

269. On information and belief, after Piña, alone or with Campbell, communicated with Keough, Silvia, or both on October 12 or 13, 2023 (¶ 116), and after speaking with Silvia, Keough decided before the October 13 Meeting to withdraw from the transaction (¶ 118(b)–(c)).

270. Keough concealed that decision from Plaintiff. On October 11, 2023, he wrote that they would "finish the deal" (¶ 109). On October 12, 2023, he wrote to all participants that he "look[ed] forward to trying to find a resolution" (¶ 111(d)). On October 13, 2023, he declined to speak with Plaintiff before the meeting (¶ 114). He then announced his withdrawal in his opening statement, which was the first Plaintiff learned of it (¶ 118).

271. Keough had a duty to disclose his decision because his October 11 and October 12, 2023 statements, made after or while he was deciding to withdraw, were misleading without it.

272. Plaintiff relied on Keough's statements and silence, and on the terms Keough had agreed to before the October 13 Meeting: that once Plaintiff cleared the other writers, Keough would get rid of Campbell and close the transaction (¶¶ 93, 100). By October 10, 2023, Plaintiff had cleared all of the other writers (¶¶ 96, 102). In reliance, on October 12, 2023, Plaintiff

offered Campbell $2,500 and then $5,000 to clear title (¶ 110); he attended the October 13 Meeting expecting Keough to close; and on October 13, 2023, he negotiated to buy out Campbell and texted Keough to confirm that Keough would complete the transaction (¶¶ 132–133).

273. Keough's concealment denied Plaintiff the opportunity to save the transaction. Had Keough disclosed his decision before the October 13 Meeting, Plaintiff could have addressed Keough's concerns, resolved Campbell's claim, or restructured the transaction before Keough announced his withdrawal in front of Campbell and Piña. As a direct and proximate result, Plaintiff lost the $50,000 purchase price, employment as set writer, WGA membership assistance, and 1% of gross profits, and suffered other consequential damages.

**COUNT II: BREACH OF CONTRACT**

274. Plaintiff incorporates by reference all prior allegations relevant to this Count.

**A. Against Keough and Manny LLC**

275. On or about October 1, 2023, Keough promised Plaintiff that if Plaintiff cleared the other writers of *ESCALATOR Feature*, the deal would go through. On or about October 7, 2023, Keough, on behalf of himself and Manny LLC, further promised that if Plaintiff got rid of all the other writers, Keough would: (a) get rid of Campbell; (b) pay Plaintiff $50,000 to purchase *ESCALATOR Feature*; (c) employ Plaintiff as set writer; (d) assist Plaintiff in joining the Writers Guild of America; and (e) provide Plaintiff with 1% of gross profits (together, the "Keough Agreement") (¶¶ 93, 100).

276. Plaintiff performed by acquiring the copyrights of Gilligan and Das on October 4, 2023 for $200 (¶ 96) and of Rennie and Fishbane on October 10, 2023 for $2,000 (¶ 102). Keough

performed in part by renting the former Sears store at the Solomon Pond Mall as a filming location for *ESCALATOR Feature* before the October 13 Meeting (¶ 101).

277. On information and belief, having decided by October 12, 2023 not to proceed, Keough concealed that decision from Plaintiff (¶¶ 109, 111, 114), and at and after the October 13 Meeting breached the Keough Agreement by refusing to purchase *ESCALATOR Feature* and by failing to get rid of Campbell (¶¶ 118, 127, 130, 133).

278. As a direct and proximate result of Keough's breach, Plaintiff has suffered damages, including but not limited to a $2,200 out-of-pocket expense, the lost opportunity for a $50,000 purchase price, lost employment as set writer, lost WGA membership assistance, lost 1% of gross profits, wasted time and expenses, and other consequential damages.

279. The Keough Agreement carried an implied covenant of good faith and fair dealing. Keough breached that covenant by deciding, on information and belief, by October 12, 2023, not to proceed; concealing that decision while Plaintiff continued to rely on the Keough Agreement; and repudiating it at the October 13 Meeting, depriving Plaintiff of the fruits of the bargain after Plaintiff had performed.

280. In the alternative, if the oral agreement is deemed unenforceable at law, Plaintiff seeks equitable restitution for the benefits conferred and expenditures incurred.

## COUNT III: PROMISSORY ESTOPPEL

281. Plaintiff incorporates by reference all prior allegations relevant to this Count.

### A. Against Sims and RPMTA

282. Sims agreed to represent Plaintiff in shopping his co-authored screenplays with Campbell (¶ 90(a)) and, on or about October 10, 2023, promised in writing that a shopping agreement for Plaintiff's own execution would be forthcoming (¶ 107(b)).

283. Plaintiff reasonably relied on Sims's promise: Plaintiff did not engage another agent to shop his co-authored screenplays, because Sims was already shopping the PROJECTS with Campbell, and a second agent shopping the same works would have created conflicting representations to buyers. Plaintiff later followed up with Willi and Esper and learned that neither had received a shopping agreement.

284. Sims breached this promise by: (a) failing to provide the promised shopping agreement to Plaintiff; (b) disclaiming the promise on or about October 18, 2023, and thereafter ceasing substantive communication with Plaintiff (¶¶ 140–142); and (c) marketing the PROJECTS without Plaintiff's participation (¶¶ 108, 136–137, 203).

285. As a direct and proximate result of Sims's breach of promise, Plaintiff has suffered damages including lost representation opportunities, lost business opportunities, and lost revenue.

286. Plaintiff's claims against Sims and RPMTA arising from the promise accrued no earlier than October 18, 2023, when Sims first indicated that she would not perform it.

**B. Against Keough and Manny LLC**

287. In the alternative to an enforceable contract, Keough made the promises of October 1 and October 7, 2023 described above, including the promise to purchase *ESCALATOR Feature* for $50,000 once Plaintiff cleared the other writers (¶¶ 93, 100).

288. Plaintiff reasonably and foreseeably relied on Keough's promise and incurred the $2,200 expense and other preparatory costs in reliance (¶¶ 96, 102).

289. Injustice can only be avoided by enforcing the promise or awarding reliance damages to Plaintiff in the amount of his out-of-pocket expenditures and other losses.

## COUNT IV: UNJUST ENRICHMENT

290. Plaintiff incorporates by reference all prior allegations relevant to this Count.

**A. Against Sims, RPMTA, Powerful LLC, and Levine**

291. Sims, RPMTA, and Powerful LLC have marketed and attempted to profit from *Money Tree*, *WILBUR*, and *Cat-Astrophe* — projects in which Plaintiff has ownership and/or financial interests based on his legal services, creative contributions, and assignments (¶¶ 108, 203).

292. Levine, as a member of Powerful LLC holding an interest that grew to 50% and whose own creative works were marketed alongside the PROJECTS on the same website, has likewise received or stands to receive the benefit of Plaintiff's work on these projects without providing compensation or attribution.

293. Sims, RPMTA, Powerful LLC, and Levine know or should know that Plaintiff has ownership or financial interests in these projects based on: (a) contractual obligations documented in the Related Action; (b) Plaintiff's documented legal and creative services; (c) the pending litigation regarding these projects, of which, on information and belief, they learned through Campbell no later than October 2025, and of which Plaintiff gave Levine, Sims, and Powerful LLC direct written notice on November 3, 2025 (¶¶ 223–224, 229(b)); and (d) the facts concerning Sims's and Levine's knowledge alleged in ¶¶ 256–257.

294. It would be unjust for Sims, RPMTA, Powerful LLC, and Levine to retain the benefits of Plaintiff's contributions without compensating him.

295. Plaintiff is entitled to restitution for the value of his contributions to these projects.

## COUNT V: COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)

296. Plaintiff incorporates by reference all prior allegations relevant to this Count.

**A. Against Sims, RPMTA, Powerful LLC, and Levine**

297. Plaintiff owns *Money Tree*. Esper was the sole claimant under Registration No. TXu002242158 (¶ 26). On March 12, 2024, Campbell represented to the Court in the Related Action, under Rule 11, that he had given *Money Tree* to Esper, and Esper's statement filed with it confirmed that he was its "sole owner" (¶ 186). On October 17, 2025, Esper assigned to Plaintiff all of his right, title, and interest in *Money Tree*, which the assignment describes as written by Esper in collaboration with Campbell "and later fully assigned to Assignor by Campbell," including the right to sue for past infringements (¶ 225).

298. Plaintiff acquired Esper's interest in good faith and for value, paying Esper $10, in reliance on Registration No. TXu002242158, which lists Esper as sole claimant, and on Campbell's and Esper's representations to the Court that Esper was the sole owner (¶¶ 26, 186, 225).

299. Having given *Money Tree* to Esper, Campbell held no rights in it that he could license to Powerful LLC, Sims, or Levine. Esper never signed any agreement allowing Campbell to assume sole authorship or ownership, and he was not aware that *Money Tree* was listed on powerfulstorylines.com as written solely by Campbell or that it was being marketed by Powerful LLC (¶ 222(a)–(b)). Esper's request to have his name removed (¶ 191) did not affect his ownership of *Money Tree* or his right to assign it to Plaintiff, and it did not transfer his rights. Esper's statements to Campbell that he no longer wished to be part of the project were not a license; they were made while Campbell claimed to be a co-owner, who needed none. In any event, any permission Esper may have given was personal to Campbell and did not extend to Powerful LLC, Sims, or Levine. Plaintiff never authorized them to reproduce, distribute, or prepare derivative works of *Money Tree*.

300. In the alternative, to the extent Campbell is found to have retained a co-ownership interest in *Money Tree* despite his representation to the Court under Rule 11 that he had given it to Esper, and Esper's confirmatory statement filed with it (¶¶ 186, 216(c), 259), Plaintiff holds Esper's undivided ownership interest by assignment and is entitled to an accounting of all profits derived from *Money Tree* by Campbell and those acting under him, as alleged in Count XI.

301. Without authorization: (a) on September 12, 2024, Levine prepared the 2024 Version, which reproduces verbatim approximately 90% of the Campbell-Esper screenplay and is a derivative work based on it, and whose title page credits Levine with a "Polish" (¶ 193); (b) a copy of the 2024 Version was distributed to Sims, who produced it on April 1, 2026 (¶ 242(a)); and (c) on information and belief, Powerful LLC and its members or agents emailed copies of *Money Tree*, including the 2024 Version, to parties who expressed interest through powerfulstorylines.com (¶¶ 203, 206, 209).

302. Plaintiff is also a co-author and co-owner of *Last Door*, registered under Registration No. PAu004191778 (¶¶ 77, 236(b)). On information and belief, after October 14, 2023, under the revised shopping agreement covering *Money Tree*, *Last Door*, and *WILBUR* (¶¶ 136–137), Sims distributed copies of *Last Door* to prospective buyers without Plaintiff's authorization (¶¶ 206–208).

303. Sims and Levine, as founding members of Powerful LLC, each had the right and ability to supervise its marketing of *Money Tree* and a direct financial interest in it, Levine's own works being marketed on the same website (¶¶ 202–203). Each knew of that marketing and materially contributed to it (¶¶ 256–257). Sims and Levine are therefore vicariously and

contributorily liable for Powerful LLC's infringement, in addition to their direct liability for their own acts.

304. To the extent copies of *Money Tree* were distributed through powerfulstorylines.com before Powerful LLC was formed on July 13, 2025, those who registered and operated the website, on information and belief including Sims and Levine, are directly liable for that infringement (¶¶ 194–196).

305. Sims acted as a partner or agent of RPMTA, which is liable for her infringing acts within the scope of that role.

306. The infringement was willful. Sims and Levine knew that Esper was a co-author of *Money Tree* and that Plaintiff claimed interests in it and in *Last Door* (¶¶ 182, 191, 216, 256–257).

307. Each act of infringement alleged in this Count occurred within three years before the filing of this Complaint (17 U.S.C. § 507(b)). *Money Tree* and *Last Door* were registered before the infringement began (¶¶ 26, 77), so statutory damages and attorney's fees are available (17 U.S.C. § 412).

308. Plaintiff is entitled to his actual damages and the infringers' profits or, at his election, statutory damages, enhanced for willfulness, under 17 U.S.C. § 504, and to injunctive relief under 17 U.S.C. § 502.

**B. Against Piña**

309. On February 3, 2024, Piña told Plaintiff that "the other projects actually have people interested in them, thanks to me," and "I've got other people who are willing and interested in optioning these other projects," referring to *Money Tree*, *Last Door*, and others (¶ 178). On information and belief, Piña reproduced and distributed, or caused Campbell to reproduce and

distribute, copies of *Money Tree* and *Last Door* to those persons, without the authorization of Esper or Plaintiff (¶ 179).

310. Piña's reproduction and distribution of those copies, directly or by causing and materially contributing to Campbell's, infringes Plaintiff's exclusive rights under 17 U.S.C. § 106(1) and (3) in *Last Door* and the rights in *Money Tree* that Plaintiff now holds by assignment. Each act that occurred within three years before the filing of this Complaint is a direct and proximate cause of damages to Plaintiff.

## COUNT VI: TORTIOUS INTERFERENCE

311. Plaintiff incorporates by reference all prior allegations relevant to this Count.

**A. Against Piña (re: legal services contract)**

312. Plaintiff and Campbell had valid contracts, including the Fee Agreement and the Contingent Contract (¶¶ 44, 58, 60). Piña knew of them, having received the executed Contingent Contract and the other DOCUMENTS from Campbell on July 26, 2023 (¶ 67).

313. Piña intentionally interfered with those contracts by: (a) on information and belief, urging Campbell to terminate Plaintiff's legal representation without compensation as *Money Tree* neared funding (¶¶ 147–149); (b) on information and belief, paying, alone or with Sims, for the attorney who sent the November 9, 2023 termination letter (¶¶ 148, 150); and (c) after the termination, obstructing Plaintiff's efforts to obtain compensation, including by joining Campbell's November 21, 2023 call to Plaintiff's counsel, demanding that Plaintiff not communicate with Campbell or with Austin, who had been mediating between them, and conditioning any discussion of settlement on threats, after which Austin, who had planned to resume mediating, directed Plaintiff to speak with Piña, and Piña rejected Plaintiff's December 6, 2023 settlement offer as "absurd" (¶¶ 143, 154, 157–160, 164, 167, 170–171).

314. Piña's interference was improper in motive and means. She acted to extract payment for Campbell and to keep control of the PROJECTS, and she used false accusations that Plaintiff had made death threats, and threats against the law license of Plaintiff's counsel (¶¶ 132, 158–159, 164, 167, 171, 173).

315. As a direct and proximate result, Campbell terminated Plaintiff's representation without compensation for 906.5 documented hours of work (¶¶ 144, 148), and Plaintiff has been unable to obtain that compensation.

**B. Against Piña (re: Keough transaction)**

316. Plaintiff had the Keough Agreement with Keough and Manny LLC (¶¶ 93, 100), and he had performed his part by clearing the other writers (¶¶ 96, 102). As of October 11, 2023, Keough was ready to "finish the deal" (¶ 109).

317. Piña knew of the transaction no later than the morning of October 12, 2023, when Campbell brought her into his call with Plaintiff and she rejected Plaintiff's offer to buy out Campbell's claimed interest (¶ 110(d)–(e)).

318. On information and belief, between 11:56 a.m. ET on October 12, 2023 and the October 13 Meeting, Piña, alone or with Campbell, communicated with Keough, Silvia, or both regarding Plaintiff, Campbell, or the transaction (¶ 116). Within hours, Keough's position changed. After learning that Piña would attend, he required Silvia at every meeting and reserved the right to "withdraw our interest in the project entirely" (¶ 111). On the morning of October 13, 2023, he refused to speak with Plaintiff (¶ 114). He opened the October 13 Meeting by withdrawing his offer "after speaking with my partner" (¶ 118).

319. At the October 13 Meeting, Piña continued the interference in Keough's and Silvia's presence: she urged them to "step away from dealing with these people," called the project a

"piece of shit project," announced that she would "take it over" and give it to Keough and Silvia, and disparaged the Contingent Contract as "pretend," a "kickback" arrangement, and "four pages of a joke," suggesting that Campbell's signature on it was not authentic (¶¶ 123–125, 131). (Campbell later admitted signing the Contingent Contract (¶ 215(a))). Keough responded, "I heard Shelley loud and clear," and "we're out" (¶¶ 127, 130).

320. Piña's interference was improper in motive and means. She knew since 2021 that Campbell held no interest in *ESCALATOR Feature* (¶¶ 28–31), yet she acted to block the sale unless Plaintiff paid Campbell, demanding $7,500 immediately after the meeting while claiming she could get Keough to close (¶ 132), and she used false and disparaging statements about Plaintiff's contract.

321. In the alternative, to the extent Keough had not finally decided to withdraw before the October 13 Meeting, Piña's conduct at the meeting converted his conditional withdrawal, made while he remained "still open to the project," into a permanent refusal (¶¶ 119, 127, 130, 133).

322. As a direct and proximate result, the Keough transaction collapsed, and Plaintiff lost the $50,000 purchase price, employment as set writer, WGA membership assistance, 1% of gross profits, and the prospect of serving as Keough's attorney on his upcoming projects (¶ 86).

**C. Against Sims and RPMTA**

323. Plaintiff and Campbell had valid contracts, including the Contingent Contract and the Five Writers Agreements, and Plaintiff had an advantageous relationship with Sims's prospective representation in shopping his co-authored screenplays (¶¶ 58, 90, 107). Sims knew of the contracts, having received them from Campbell on July 26, 2023, and having been told of the Contingent Contract by Plaintiff in August 2023 (¶¶ 67, 79).

324. Sims intentionally interfered with those contracts and with Plaintiff's business prospects by: (a) after October 13, 2023, preparing a revised shopping agreement for Campbell alone, omitting the PROJECTS whose ownership Plaintiff disputed, and dealing with Campbell alone regarding the PROJECTS (¶¶ 136–137, 140–142); (b) on information and belief, encouraging Campbell to proceed with shopping the PROJECTS without Plaintiff's participation or knowledge; (c) forming Powerful LLC with Campbell, Levine, and Avery in 2025 to market PROJECTS containing Plaintiff's contributions while excluding Plaintiff (¶¶ 202–204); and (d) on information and belief, alone or with Piña, contacting Plaintiff's voice talent agency, Eris Talent Agency, and causing it to terminate its representation of Plaintiff on October 24, 2025 (¶¶ 227–228).

325. Sims's interference was improper and without justification. As a direct and proximate result, Plaintiff has suffered damages including lost representation opportunities, exclusion from the marketing of his creative works, and deprivation of his contractual rights.

326. Plaintiff did not know, and could not reasonably have known, of Sims's exclusion of Plaintiff from the shopping of the PROJECTS before her October 18, 2023 email, and he did not learn of her continuing work with Campbell or of Powerful LLC until Campbell's September 6, 2025 supplemental discovery responses in the Related Action (¶¶ 140–142, 216–217).

**D. Against Sims and RPMTA (re: legal services contract)**

327. This Subpart is pleaded in the alternative to Subpart A.

328. Sims knew of the Contingent Contract, having received it from Campbell on July 26, 2023, and having been told of it by Plaintiff in August 2023 (¶¶ 67, 79).

329. On information and belief, Sims, alone or with Piña, urged Campbell to terminate Plaintiff's legal representation without compensation, as *Money Tree*, which Sims was packaging with Campbell, neared funding, and paid for the attorney who sent the November 9, 2023 termination letter (¶¶ 108, 147–150). Sims acted within the scope of her role as a partner and agent of RPMTA, which is liable for her conduct.

330. Sims's interference was improper and without justification. As a direct and proximate result, Campbell terminated Plaintiff's representation without compensation for 906.5 documented hours of work (¶¶ 144, 148).

**E. Against Piña (re: Eris Talent Agency)**

331. This Subpart is pleaded in the alternative to Subpart C(d).

332. Plaintiff had a contractual relationship with his voice talent agency, Eris Talent Agency. On information and belief, Piña, alone or with Sims, knowing of that relationship, contacted Eris Talent Agency and caused it to terminate its representation of Plaintiff on October 24, 2025 (¶¶ 227–228). Piña had earlier mocked Plaintiff's acting career and claimed to have reported him to the Screen Actors Guild as "a pretend actor" (¶¶ 159(a), 178(a)).

333. Piña's interference was improper and without justification. As a direct and proximate result, Plaintiff lost his voice talent representation and the business opportunities it provided.

**COUNT VII: CIVIL CONSPIRACY**

334. Plaintiff incorporates by reference all prior allegations relevant to this Count.

**A. Against Piña**

335. Piña and Campbell (who is not a party to this action) knowingly combined, agreed, and conspired to deprive Plaintiff of compensation for his legal and creative services, to extract

payment from him for interests Campbell did not hold, and to interfere with his ability to monetize and control the projects he co-created.

336. In furtherance of this conspiracy, the conspirators committed overt acts including, but not limited to: (a) Piña's September 17, 2021 solicitation of an "offer" for Campbell from the actual writers of *ESCALATOR Feature* (¶¶ 28–31); (b) Campbell's misrepresentations of authorship to induce Plaintiff's services (¶¶ 36, 42); (c) Campbell's bringing Piña into the October 12, 2023 call and Piña's rejection of Plaintiff's buyout offer (¶ 110(d)–(e)); (d) on information and belief, Piña's communications with Keough, Silvia, or both before the October 13 Meeting (¶ 116), and her disparagement of Plaintiff and his contract at the meeting (¶¶ 123–125, 131); (e) Campbell's and Piña's demand for $7,500 immediately after the meeting (¶ 132); (f) Campbell's termination of Plaintiff's representation without compensation, on information and belief at Piña's urging and with Piña paying for the termination letter (¶¶ 147–150); (g) the November 21, 2023 call to Plaintiff's counsel (¶ 154); Campbell's November 22, 2023 police complaint accusing Plaintiff of threatening him, which the police found "unfounded" (¶¶ 155, 169); and Piña's voicemail campaign against Plaintiff's counsel, beginning November 24, 2023, repeating and expanding that accusation into death threats against Campbell's family (¶¶ 157–159, 164, 167, 171); (h) Piña's February 3, 2024 offer to sell Plaintiff Campbell's purported interests "for very minimal rate" (¶ 178); and (i) Piña's failure to respond to Plaintiff's subpoena (¶¶ 214, 220).

337. As a direct and proximate result of this conspiracy, Plaintiff has suffered damages including lost compensation, lost business opportunities, reputational harm, emotional distress, and interference with his creative works.

**B. Against Sims, RPMTA, Powerful LLC, and Levine**

338. Sims, RPMTA, Powerful LLC, and Levine, together with Campbell (who is not a party to this action), knowingly combined, agreed, and conspired to defraud Plaintiff by misrepresenting the authorship and ownership of creative works that Plaintiff co-authored, owned, and represented, excluding him from projects, and exploiting his creative contributions without compensation or attribution.

339. In furtherance of this common scheme, the conspirators committed overt acts including, but not limited to: (a) Sims's and RPMTA's initial agreement to represent Plaintiff in shopping the PROJECTS, followed by their reneging on that agreement and joining Campbell in excluding Plaintiff (¶¶ 90, 107, 136–142); (b) on information and belief, Sims's urging Campbell to terminate Plaintiff's legal representation without compensation on or about November 9, 2023, as *Money Tree* neared funding, and paying for the attorney who sent the termination letter (¶¶ 147–150); (c) on information and belief, the registration of powerfulstorylines.com on November 3, 2024, more than eight months before Powerful LLC was formed, in preparation for marketing the PROJECTS (¶¶ 194, 196); (d) Sims's and Campbell's formation of Powerful LLC in July 2025, with Levine serving as its Organizer and a founding member alongside Avery, as a further vehicle through which to market the PROJECTS while excluding Plaintiff (¶ 202); (e) Powerful LLC's marketing of *Money Tree*, *WILBUR*, and *Cat-Astrophe*, incorporating Plaintiff's contributions while omitting his name (¶¶ 203–205); (f) Sims's and Campbell's concealment of Powerful LLC's existence, including Campbell's omission of Levine and Powerful LLC from his disclosures and discovery responses in the Related Action until September 6, 2025, and Sims's production of no documents in response to Plaintiff's subpoena for more than seven months, followed by her

production of the documents Campbell forwarded to her without the July 26, 2023 email that transmitted them, a production that remains incomplete despite Plaintiff's demand (¶¶ 199–200, 216, 241–244); and Campbell's August 11, 2025 letter to the Court accusing Plaintiff of "stalking like behavior" at Sims's office, which Sims later attributed to Piña, and as to which Sims produced only three screenshots of chat messages (¶¶ 210–213, 226, 242); (g) allowing the registration of powerfulstorylines.com to lapse on November 3, 2025, rather than renewing it, shortly after Plaintiff's October 2025 conferences with Campbell's counsel regarding *Money Tree* and the planned joinder of Powerful LLC and its members, and the March 2026 restructuring of Powerful LLC's membership to remove Sims and Avery rather than dissolving the entity — conduct from which it may be inferred that Powerful LLC was preserved, not wound down, in anticipation of resuming exploitation of the PROJECTS once the ownership disputes underlying this action are resolved — leaving Campbell and Levine as its sole remaining members with an increased mutual financial stake in the continued exploitation of the PROJECTS free of Plaintiff's competing claims (¶¶ 223–224, 240, 255); and (h) Levine's June 12, 2026 payment of $3,500 toward Campbell's bankruptcy counsel, made at a time when Levine held a 50% interest in Powerful LLC and therefore had a direct financial stake in Campbell's ability to continue contesting Plaintiff's ownership claims to the PROJECTS in the related litigation and bankruptcy proceeding (¶ 248).

340. These actions were undertaken jointly and in concert to deprive Plaintiff of credit, ownership, and compensation for his creative and legal contributions. As a direct and proximate result of this conspiracy, Plaintiff has suffered damages including lost compensation, lost business opportunities, and interference with his creative works.

## COUNT VIII: AIDING AND ABETTING FRAUD

341. Plaintiff incorporates by reference all prior allegations relevant to this Count.

**A. Against Sims and RPMTA**

342. Campbell committed fraud against Plaintiff by falsely representing that he was the sole writer of *ESCALATOR Short*, *ESCALATOR Feature*, and *Obstacle*, and an equal co-writer of *Serene*, *Last Door*, *Open House*, and *Money Tree*, to induce Plaintiff to provide legal and creative services, and thereafter by holding himself out as the sole writer and owner of PROJECTS that Plaintiff co-wrote and owned.

343. Sims actually knew of Campbell's fraud. From July 26, 2023, she possessed the executed Contingent Contract and the Five Writers Agreements (¶ 67), and she knew that Campbell was not the sole writer or owner of the PROJECTS and that Plaintiff claimed ownership and financial interests in them (¶ 256).

344. With that knowledge, Sims substantially assisted Campbell's fraud by: (a) reneging on her agreement to represent Plaintiff and dealing with Campbell alone regarding the PROJECTS (¶¶ 136–142); (b) packaging and marketing *Money Tree* with Campbell while excluding Plaintiff (¶ 108); (c) co-founding Powerful LLC with Campbell and marketing *Money Tree*, *WILBUR*, and *Cat-Astrophe* under Campbell's name while omitting Plaintiff's (¶¶ 202–204); and (d) concealing Powerful LLC and her dealings with Campbell, including through her response to Plaintiff's subpoena (¶¶ 220, 241–244).

345. Sims acted within the scope of her role as a partner and agent of RPMTA, which is liable for her conduct.

346. As a direct and proximate result, Plaintiff has suffered damages including lost compensation, lost business opportunities, and exclusion from the marketing and exploitation of his creative works.

**B. Against Piña**

347. Piña actually knew of Campbell's fraud. No later than September 18, 2021, she knew that Rennie and Fishbane had written *ESCALATOR Feature* and that Campbell had no written agreement with them (¶¶ 28–31). From July 26, 2023, she possessed the executed Contingent Contract and the Five Writers Agreements (¶ 67).

348. With that knowledge, Piña substantially assisted Campbell's fraud, including Campbell's continuing to hold himself out as the owner of PROJECTS he did not own, by: (a) on October 12, 2023, joining Campbell's call with Plaintiff and rejecting Plaintiff's offer to buy out Campbell's claimed interest in *ESCALATOR Feature* (¶ 110(d)–(e)); (b) on October 13, 2023, demanding, with Campbell, $7,500 for Campbell's purported interest in *ESCALATOR Feature* (¶ 132(a)); (c) on information and belief, urging Campbell to terminate Plaintiff's legal representation without compensation, and paying for the termination letter (¶¶ 147–150); and (d) on February 3, 2024, offering to sell Plaintiff Campbell's purported interests in *ESCALATOR Feature* and *Serene* "for very minimal rate" (¶ 178).

349. As a direct and proximate result, Plaintiff has suffered damages, including the loss of compensation for the legal and creative services Campbell's fraud induced, and the loss of the Keough transaction.

## COUNT IX: BREACH OF FIDUCIARY DUTY

350. Plaintiff incorporates by reference all prior allegations relevant to this Count. This Count is pleaded in the alternative to Counts VI and VII.

**A. Against Sims and RPMTA**

351. On or about September 28, 2023, Sims agreed to represent Plaintiff in shopping his collaborative screenplay works, and on October 10, 2023, over her "agent/partner" signature, she confirmed in writing that she would send shopping agreements to Plaintiff and Campbell's other co-writers (¶¶ 90(a), 107). Plaintiff accepted and relied on that undertaking. Sims thereby became Plaintiff's agent with respect to shopping those works and owed him the fiduciary duties of loyalty and full disclosure.

352. While serving as Plaintiff's agent, Sims breached those duties by: (a) dealing with Campbell alone regarding the shopping of the PROJECTS, although she knew his claimed interests in them conflicted with Plaintiff's, including by revising the shopping agreement with Campbell alone and sending it to him on or before October 14, 2023 (¶¶ 136–137); and (b) on October 18, 2023, abandoning the undertaking in favor of Campbell, stating only, "William and I are in direct contact regarding shopping agreements" (¶ 140).

353. Sims acted within the scope of her role as a partner and agent of RPMTA, which is liable for her conduct.

354. As a direct and proximate result, Plaintiff has suffered damages including lost representation, lost business opportunities, and exclusion from the marketing and exploitation of his creative works.

**COUNT X: UNFAIR AND DECEPTIVE ACTS (M.G.L. c. 93A)**

355. Plaintiff incorporates by reference all prior allegations relevant to this Count.

356. On or about November 3, 2025, Plaintiff sent written demands for relief under M.G.L. c. 93A to Piña, Keough, Manny LLC, Sims, RPMTA (addressed in care of Sims and Richer), and Powerful LLC (addressed in care of its members, including Levine) (¶ 231). Sims, RPMTA

(by Richer), and Powerful LLC (by Levine) responded, denying all liability and tendering no settlement (¶ 233). Piña, Keough, and Manny LLC never responded (¶ 234).

357. Sims, Richer, RPMTA, Piña, Powerful LLC, and Levine do not maintain a place of business within the Commonwealth and, on information and belief, do not keep assets within the Commonwealth, so the demand requirement of § 9(3) does not apply to them. Each nonetheless received Plaintiff's November 3, 2025 demand, directly or as the person to whom it was addressed and who responded.

358. Plaintiff is a "person" within the meaning of M.G.L. c. 93A, § 1. In providing legal services to Campbell, Plaintiff acted in a business capacity. In his dealings with Sims, RPMTA, Piña, Keough, Manny LLC, Powerful LLC, and Levine concerning the shopping, sale, and exploitation of his screenplays, Plaintiff acted as an individual writer seeking their services, and not in trade or commerce, and he brings this Count under § 9. In the alternative, to the extent Plaintiff is found to have acted in trade or commerce in those dealings, he brings this Count under § 11.

359. The unfair and deceptive acts alleged in this Count occurred primarily and substantially within the Commonwealth. At all relevant times Plaintiff resided and worked in Massachusetts, and each Defendant's conduct was directed at him there and injured him there. In particular: (a) Keough and Manny LLC are based in Massachusetts, negotiated the Keough Agreement with Plaintiff in person in Worcester, Massachusetts, and planned to produce *ESCALATOR Feature* as a feature film shot in Massachusetts, renting a filming location for it in Marlborough, Massachusetts (¶¶ 93, 101); (b) Piña interfered with that Massachusetts transaction and film, directing her statements on October 12 and 13, 2023 to Plaintiff and to Keough and Silvia in Massachusetts, after learning in 2021 from Rennie, a Massachusetts

resident, and Fishbane that Campbell held no interest in the screenplay (¶¶ 28–31, 110, 117–134); (c) Piña directed her voicemail campaign to Plaintiff's Massachusetts counsel and claimed to have reported Plaintiff to the Massachusetts Board of Bar Overseers and the Massachusetts police (¶¶ 151, 157–159, 164, 167, 171); (d) Sims directed her shopping agreement, her written promise to send shopping agreements, and her October 18, 2023 email to Plaintiff in Massachusetts; never provided the promised shopping agreements to Plaintiff or to Esper, both Massachusetts residents; received Keough's September 22, 2023 email regarding the *ESCALATOR* transaction (¶ 85(b)); and received notice from Plaintiff's Massachusetts counsel that the PROJECTS were encumbered by the Related Action pending in this Court (¶¶ 89, 107, 140–141, 180, 182, 222); and (e) Powerful LLC, Sims, and Levine marketed *Money Tree*, which was co-written by Esper, a Massachusetts resident, and in which Plaintiff, a Massachusetts resident, held ownership and financial interests, while the Related Action concerning those works was pending in this Court (¶¶ 180, 194–196, 203).

**A. Against Sims**

360. Sims engaged in business or trade as a talent agent representing clients in the entertainment industry, including soliciting, negotiating, and marketing creative projects written by Massachusetts residents (Plaintiff, Esper, and Rennie) and acting through her agency RPMTA to provide services and business opportunities to actors, writers, and other creatives in Massachusetts.

361. Sims's conduct constitutes unfair or deceptive acts or practices in violation of Chapter 93A, including: (a) offering to send Plaintiff shopping agreements for the PROJECTS, then reneging and excluding him from them; (b) on information and belief, urging Campbell to terminate Plaintiff's legal representation without compensation and paying for the attorney who

sent the termination letter; (c) forming Powerful LLC with Campbell and Levine while purporting to act as an independent agent; (d) marketing projects containing Plaintiff's contributions without his knowledge or consent, including *Money Tree* under a false credit to Campbell alone; (e) producing no documents in response to Plaintiff's subpoena for more than seven months, and then producing the documents Campbell forwarded to her without the July 26, 2023 email that transmitted them, a production that remains incomplete despite Plaintiff's demand; and (f) conspiring with Campbell to exclude Plaintiff from projects he owned or co-authored.

362. Sims's conduct was willful and knowing. As a direct and proximate result, Plaintiff has suffered damages including lost representation opportunities, lost business opportunities, and exclusion from marketing and exploitation of his creative works.

**B. Against RPMTA**

363. RPMTA is a California-based talent agency engaged in trade or commerce within the meaning of Chapter 93A by representing creative professionals, negotiating contracts, and soliciting business with and from Massachusetts residents through its agents, including Sims. RPMTA participated in, ratified, or benefited from the unfair and deceptive acts of its agents as alleged herein.

**C. Against Piña**

364. Piña engaged in trade or commerce as a talent manager representing clients in the entertainment industry, acting individually and doing business as Golden Pineapple Management, and conducting business in or from Massachusetts by communicating with and negotiating regarding creative projects with Plaintiff (a Massachusetts attorney and writer) and Keough and Manny LLC (Massachusetts producers).

365. Piña's conduct constitutes unfair or deceptive acts or practices in violation of Chapter 93A, including: (a) knowing since her 2021 dealings with Massachusetts-resident Rennie that Campbell held no interest in *ESCALATOR Feature* (¶¶ 28–31), joining Campbell's October 12, 2023 call and rejecting Plaintiff's buyout offer (¶ 110(d)–(e)), on information and belief communicating with Keough, Silvia, or both before the October 13 Meeting (¶ 116), disparaging Plaintiff and his contract at the meeting until Keough withdrew (¶¶ 123–131), and then demanding $7,500 for Campbell's nonexistent interest while claiming she could get Keough to close (¶ 132); (b) on information and belief, advising Campbell to terminate Plaintiff without compensation and paying for the attorney who sent the termination letter; (c) defaming Plaintiff with false allegations of death threats; (d) attempting to extort money from Plaintiff through false allegations of death threats (¶¶ 155–162, 164–166, 169, 172–173); (e) attempting to sell Campbell's non-existent interests in *ESCALATOR Feature* and *Serene*, including on February 3, 2024; (f) on information and belief, alone or with Sims, causing Eris Talent Agency to terminate its representation of Plaintiff; (g) harassing Attorney Gindi to intimidate Plaintiff and discourage his representation; and (h) making vulgar and lewd comments during the October 13 Meeting regarding the size of the men's genitalia (¶ 125).

366. Piña's conduct was willful and knowing. As a direct and proximate result, Plaintiff has suffered damages including the lost $50,000 Keough deal, lost employment opportunities as an entertainment attorney, lost compensation for legal services, emotional distress, and damage to professional reputation.

**D. Against Keough**

367. Keough is engaged in business or trade in Massachusetts and at all relevant times engaged in conduct in trade or commerce as defined by Chapter 93A.

368. Keough's conduct constitutes unfair or deceptive acts or practices in violation of Chapter 93A, including: (a) inducing Plaintiff to expend $2,200 to buy out undisclosed co-writers to clear title (¶¶ 93, 96, 100, 102); (b) failing to disclose a material change in his intent to proceed with the $50,000 deal until the October 13 Meeting, while telling Plaintiff they would "finish the deal" and that he "look[ed] forward to trying to find a resolution," thereby preventing Plaintiff from protecting his interests (¶¶ 109, 111(d), 114, 118); and (c) repudiating the transaction after Piña became involved (¶¶ 111, 116, 118, 127, 130, 133).

369. Keough's conduct was knowing, willful, and designed to take advantage of Plaintiff's reliance. As a direct and proximate result, Plaintiff has suffered damages including the $2,200 out-of-pocket loss, expenses, lost business opportunities, lost $50,000 purchase price, and other consequential harms.

**E. Against Manny LLC**

370. Manny LLC is a Massachusetts limited liability company engaged in trade or commerce by managing, producing, and financing film and television projects. Manny LLC is liable for the conduct of its principal, Keough, who acted on its behalf in the dealings with Plaintiff, and Manny LLC participated in, benefited from, and ratified the unfair and deceptive acts that damaged Plaintiff.

**F. Against Powerful LLC**

371. Powerful LLC is a limited liability company formed by Campbell, Sims, Levine, and Avery to market and exploit the PROJECTS developed through Plaintiff's legal and creative services. Powerful LLC conducted business in or from Massachusetts and engaged in unfair or deceptive acts and practices in violation of Chapter 93A, including concealing its formation and

ownership from Plaintiff, misappropriating his work product, and marketing *Money Tree* under a false credit to Campbell alone.

**G. Against Levine**

372. Levine engaged in trade or commerce as a member of Powerful LLC and, following the departure of Sims and Avery, as one of its two controlling members. Levine's own creative works were marketed alongside the PROJECTS on Powerful LLC's website, giving him a direct commercial interest in that marketing activity.

373. Levine's conduct constitutes unfair or deceptive acts or practices in violation of Chapter 93A, including: (a) preparing the 2024 Version of *Money Tree*, whose title page credits Campbell alone as writer, credits Levine with a "Polish," omits Esper, and bears a false "Copyright 2023" notice, although Levine had received Esper's own title page crediting Esper as co-author (¶¶ 81, 193); and (b) participating in and benefiting from Powerful LLC's marketing of the PROJECTS, including *Money Tree* under a false credit to Campbell alone, without Plaintiff's knowledge or consent (¶¶ 202–204). Levine's financial stake in that marketing is further shown by his funding of Campbell's bankruptcy counsel at a time when Levine held a 50% interest in Powerful LLC, a stake that depended on Campbell's ability to continue contesting Plaintiff's ownership claims to the PROJECTS (¶ 248).

374. As a direct and proximate result of Levine's conduct, Plaintiff has suffered damages including exclusion from marketing and exploitation of his creative works and interference with his ownership interests.

## COUNT XI: ACCOUNTING

375. Plaintiff incorporates by reference all prior allegations relevant to this Count.

376. Plaintiff has an ownership interest in *ESCALATOR Short*, *ESCALATOR Feature*, *Serene*, *Last Door*, *Open House*, and *Money Tree* by assignment, the Five Writers Agreements, and/or contribution of written expression, and a financial interest in those and other PROJECTS by his legal services agreements and work product.

**A. Against Sims, RPMTA, and Piña**

377. Sims, as a partner or agent of RPMTA, agreed to represent Plaintiff in shopping his co-authored screenplays, sent a shopping agreement covering *Money Tree*, *Last Door*, *ESCALATOR Feature*, *Serene*, and other PROJECTS, then dealt with Campbell alone regarding the shopping of those PROJECTS, and, on information and belief, distributed copies of *Last Door* to prospective buyers without Plaintiff's authorization (¶¶ 89–90, 107, 140–142, 302).

378. Piña told Plaintiff that people were "willing and interested in optioning" *Money Tree*, *Last Door*, and other PROJECTS "thanks to me," and, on information and belief, those persons received copies of those screenplays without Plaintiff's knowledge or authorization (¶¶ 178–179).

379. None of Sims, RPMTA, or Piña has ever disclosed to Plaintiff the identity of any prospective buyer, or any offer, option, negotiation, revenue, or other benefit relating to the PROJECTS. Those facts are known solely to these Defendants.

380. An accounting is necessary to determine what profits or benefits Sims, RPMTA, and Piña have received from shopping works in which Plaintiff holds ownership or financial interests.

**B. Against Powerful LLC, Sims, and Levine**

381. After the domain powerfulstorylines.com was registered on November 3, 2024, and no later than September 2025, until its registration expired on November 3, 2025, Powerful LLC,

Sims, and Levine marketed *Money Tree*, *WILBUR*, and *Cat-Astrophe* through that website and, on information and belief, by other means, crediting Campbell as the sole writer of *Money Tree*, and, on information and belief, distributed copies of *Money Tree*, including the 2024 Version, to interested parties (¶¶ 194–196, 203–204, 209, 255). This marketing continued the shopping of the PROJECTS without Plaintiff alleged in Subpart A.

382. None of Powerful LLC, Sims, or Levine has ever provided Plaintiff with any revenue or financial information regarding the PROJECTS. Those facts are known solely to these Defendants.

383. An accounting is necessary to determine what profits or benefits Powerful LLC, Sims, and Levine have received from exploiting works in which Plaintiff holds ownership or financial interests.

## COUNT XII: DEFAMATION

384. Plaintiff incorporates by reference all prior allegations relevant to this Count.

### A. Against Piña

385. Piña made the following false statements about Plaintiff:

(a) to Attorney Gindi (¶¶ 158–159, 164): (i) in voicemail messages of November 25, 2023, that “the police are aware of Gary Bloom’s threats” and that Plaintiff was “going to send people after” Campbell; (ii) in a voicemail message of November 27, 2023, that Plaintiff had told Campbell he “will die” and that “they will get your mother and your cat”; (iii) in voicemail messages of November 27, 2023, that she had reported Plaintiff to the Massachusetts Board of Bar Overseers, the Screen Actors Guild, and the police in Massachusetts and Pennsylvania for those threats; and (iv) in voicemail messages of December 5, 2023, that Campbell had to leave his home with his family because of Plaintiff’s threats; and, on information and belief, she

made the same death-threat accusations to the Board of Bar Overseers, the Screen Actors Guild, and law enforcement; and

(b) to Keough and Silvia at the October 13 Meeting (¶¶ 124, 131): (i) that Plaintiff's Contingent Contract was "some kind of ridiculous pretend … I'm not even going to call it an entertainment contract"; (ii) that it was "four pages of a joke"; (iii) that it contained things that were "untrue"; and (iv) that Campbell's signature "[d]oesn't look like his signature."

386. These statements were false: (a) Plaintiff never threatened Campbell or his family (¶ 173), and the Clarion Borough Police Department found Campbell's complaint "unfounded" and reported that no other report involving Plaintiff had been filed with it (¶¶ 155, 169); and (b) Campbell later admitted signing the Contingent Contract (¶ 215(a)).

387. These statements were defamatory per se, as they imputed criminal conduct (death threats) and dishonesty (forgery) to Plaintiff and damaged him in his profession as an attorney.

388. As a direct and proximate result of Piña's defamation, Plaintiff has suffered damage to his professional reputation, emotional distress, and potential loss of clients and business opportunities.

**COUNT XIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

389. Plaintiff incorporates by reference all prior allegations relevant to this Count.

**A. Against Piña**

390. Piña engaged in extreme and outrageous conduct exceeding all bounds of decency tolerated in civilized society, including a pattern of threats and coercion designed to force Plaintiff to abandon his legitimate claims for compensation, specifically including:

(a) knowingly making false accusations that Plaintiff threatened the lives of Campbell, his mother, and his pet (¶¶ 158–159, 164, 173); (b) telling Plaintiff's attorney that she had reported

those accusations to the Massachusetts Board of Bar Overseers, the Screen Actors Guild, and law enforcement in two states, and, on information and belief, so reporting them; (c) leaving Plaintiff's attorney eleven voicemail messages in two weeks (¶¶ 157–159, 164, 167, 171); (d) stating that she wished to "discuss his offer from his client, Gary Bloom, to my client, William Campbell," that Campbell "had to leave his home, take his family and leave his home, because of the threats" Plaintiff made, and warning that "if I do not get a call back from you by the end of this week, we're going to have some fun" (¶ 164); (e) deliberately sabotaging Plaintiff's $50,000 transaction with Keough at the October 13 Meeting; (f) immediately thereafter demanding $7,500 from Plaintiff for an interest she knew Campbell did not hold (¶¶ 28–31, 132); and (g) threatening Plaintiff's attorney's law license when the harassment did not achieve the desired result (¶¶ 167, 171).

391. Piña's conduct was undertaken with the specific intent to intimidate Plaintiff into abandoning his pursuit of fair compensation, interfere with his attorney-client relationship, coerce him into paying money through threats and harassment, and damage his professional reputation as leverage to force settlement.

392. As a direct and proximate result of Piña's extreme and outrageous conduct, Plaintiff suffered severe emotional distress, including sleeplessness, anxiety, stress, harm to professional reputation, partial disruption of legal representation, fear regarding his bar license, and fear and distress from false criminal allegations, including a police call on Thanksgiving Day 2023 regarding Campbell's unfounded complaint, days before Piña began repeating and expanding that accusation (¶¶ 155–156, 169), and needing to see a psychiatrist to work through the stress and anxiety.

## COUNT XIV: FALSIFICATION OF COPYRIGHT MANAGEMENT INFORMATION

## (17 U.S.C. § 1202)

393. Plaintiff incorporates by reference all prior allegations relevant to this Count.

**A. Against Powerful LLC, Sims, RPMTA, and Levine**

394. The title of a work, the name of its author, and the name of its copyright owner, including the information set forth in a notice of copyright, conveyed in connection with copies of the work, including in digital form, are copyright management information ("CMI") under 17 U.S.C. § 1202(c).

395. The CMI conveyed with *Money Tree* identified its authors as Campbell and Esper, as shown by the title page of the version Plaintiff received in 2023 (¶ 55(b)), by the title page of the May 31, 2023 Campbell-Esper draft (¶ 193), by the version Esper sent Levine on August 27, 2023 (¶ 81), and by both copyright registrations of the work (¶¶ 25–26).

396. Powerful LLC's website credited *Money Tree* as "WRITTEN BY WILLIAM JAMES CAMPBELL," omitting Esper's authorship and Plaintiff's ownership (¶ 203(b)).

397. The title page of the version of *Money Tree* that Sims produced on April 1, 2026, credits Campbell alone as writer and Levine with a "polish," omits Esper's name although it reproduces verbatim approximately 90% of the Campbell-Esper screenplay, and bears a "Copyright 2023" notice although, according to its metadata, it was created on September 12, 2024 (¶¶ 193, 242(a)). Levine received Esper's own title page crediting Esper as co-author on August 27, 2023, and thereafter appeared on a title page from which Esper's name had been removed.

398. Powerful LLC, Sims, and Levine knowingly provided and distributed false CMI in connection with *Money Tree*, including the website credit and, on information and belief,

copies of the screenplay bearing the title page described in the preceding paragraph, crediting Campbell as its sole writer, crediting Levine with a "polish," and bearing a false "Copyright 2023" notice, in violation of 17 U.S.C. § 1202(a).

399. Sims's acts alleged in this Count were undertaken as a partner or agent of RPMTA and are attributable to RPMTA. Powerful LLC, Sims, and Levine did so knowingly and with intent to induce, enable, facilitate, or conceal infringement, including by presenting Campbell as the sole author and owner of *Money Tree* so that prospective buyers would deal with Campbell and Powerful LLC to the exclusion of the work's true owners. Their knowledge and intent are shown by the facts alleged above concerning Sims's and Levine's knowledge, by Levine's receipt of Esper's title page before the appearance of the version crediting Levine's polish without Esper, by Attorney Gindi's February 16, 2024 notice to Sims, by the website's display of the same false credit, and by Campbell's acknowledgment in discovery, during the marketing period, that Esper was a co-owner of *Money Tree*.

400. Plaintiff, as assignee of all of Esper's rights in *Money Tree*, including claims for past infringements and misappropriations, is a person injured by these violations within the meaning of 17 U.S.C. § 1203(a).

401. Plaintiff is entitled to recover his actual damages or, at his election, statutory damages for each violation under 17 U.S.C. § 1203(c)(3)(B), together with such other relief as 17 U.S.C. § 1203(b) permits.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants and grant the following relief:

**A. General Relief (All Defendants):**

1. Judgment in Plaintiff's favor on all counts.
2. Compensatory damages in amounts to be proven at trial.
3. Treble damages under M.G.L. c. 93A.
4. Statutory copyright damages where appropriate under 17 U.S.C. § 504(c) and 17 U.S.C. § 1203(c)(3)(B).
5. Punitive damages where allowed by law.
6. Pre- and post-judgment interest.
7. Costs and attorney's fees.

**B. Specific Relief against Piña:**

1. Compensatory damages for tortious interference with the Keough transaction ($50,000 in lost purchase price, $2,200 in out-of-pocket expenses, and other consequential damages).
2. Compensatory damages for defamation and intentional infliction of emotional distress.
3. Damages for copyright infringement under 17 U.S.C. § 504, and a permanent injunction prohibiting Piña from reproducing, distributing, or marketing *Money Tree* or *Last Door* without Plaintiff's written consent.

**C. Specific Relief against Keough and Manny LLC:**

1. Compensatory damages of $2,200 (out-of-pocket expenses) plus $50,000 (lost purchase price) plus consequential damages including lost employment, lost WGA membership

assistance, and lost profit participation, to the extent not recovered from Piña under paragraph B above.

**D. Specific Relief against Sims, RPMTA, and Richer:**

1. Compensatory damages for tortious interference with Plaintiff's contracts and business relationships.
2. Compensatory damages for breach of promise to provide a shopping agreement.
3. Permanent injunction prohibiting marketing or exploitation of the PROJECTS without Plaintiff's written consent.

**E. Specific Relief against Sims, RPMTA, Richer, Powerful LLC, and Levine (Jointly and Severally):**

1. Complete accounting of all revenues, profits, and business dealings related to the PROJECTS.
2. All appropriate legal and equitable relief, including damages, restitution, disgorgement, and constructive trust — provided that any disgorgement or constructive trust remedy against Powerful LLC shall exclude profits or benefits attributable to Campbell's membership interest, without prejudice to Plaintiff's separate pursuit of recovery attributable to Campbell's membership interest through the claims process in Campbell's bankruptcy case or in the Related Action.
3. Order requiring immediate removal of *Money Tree*, *WILBUR*, and *Cat-Astrophe* from any website or marketing materials controlled by Powerful LLC.
4. Treble damages under M.G.L. c. 93A for unfair and deceptive acts or practices.
5. Permanent injunction prohibiting marketing or exploitation of the PROJECTS without Plaintiff's consent.

6. Correction of public records or listings misrepresenting ownership.

**F. Such other relief as the Court deems just and proper.**

Respectfully submitted on October 13, 2026,

/s/ Gary M. Bloom

Gary M. Bloom, Esq.
Mass. BBO 684982
Pro Se Plaintiff
30 Franklin St, Unit 223
Malden, MA 02148-4139
617-553-4255
GaryBloomLaw@gmail.com